UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

| | | |
|---|---|---|
| JESSICA SWEENEY, *et al,* | * | |
| | * | |
| *Plaintiffs*, | * | |
| | * | |
| VERSUS | * | CIVIL ACTION |
| | * | |
| UNIVERSITY OF COLORADO HOSPITAL | * | |
| AUTHORITY, ELIZABETH CONCORDIA, | * | |
| MARGARET REIDY, MICHAEL RANDLE, | * | |
| JILL HUNSAKER RYAN, D. RANDY | * | |
| KUYKENDALL, PATRICIA HAMMOND, | * | |
| RAYMOND ESTACIO, DANIEL PASTULA, | * | |
| SEAN TURK,TOM BUTTS, EVELINN | * | |
| BORRAYO, KENDALL ALEXANDER | * | |
| | * | |
| *Defendants*, | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT
## (JURY TRIAL REQUESTED)

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Jessica Sweeney, *et al*, (hereinafter "Plaintiffs"), who file this Complaint against Defendants, the University of Colorado Hospital Authority ("UCHA"); its policymakers, the CEO Elizabeth Concordia and Chief Medical Officer (CMO) Margaret Reidy, MD, in their individual and representative capacities; Jill Hunsaker Ryan, the Executive Director of the Colorado Department of Public Health & Environment (CDPHE), in her official and individual capacities; D. Randy Kuykendall, the Director of Health Facilities and Emergency Medical Services Division of CDPHE, in his official and individual capacities; the CDPHE Board Members as Defendants pertinent herein are Patricia Hammond, Raymond Estacio, Daniel Pastula, Sean Turk, Tom Butts, Evelinn

1

Borrayo, and Kendall Alexander, in their official and individual capacities and collectively referred to as "Board Members," (hereinafter "Defendants"), presenting allegations and causes of action as follows:

## DESCRIPTION OF CAUSE OF ACTION

**This is a §1983 case seeking redress from Defendants for the deprivation of Plaintiffs' Constitutional and federally secured right to refuse an EUA investigational drug without incurring a penalty or loss of benefits to which Plaintiffs were otherwise entitled.**

This lawsuit is being brought under 42 U.S.C. §1983 seeking redress for deprivation of rights granted to Plaintiffs by the United States Constitution, 21 U.S.C. §360bbb-3, 42 USC §247d-6d, 45 CFR Part 46, 18 U.S.C. §242, ICCPR Treaty, and the common laws of the State of Colorado to hold accountable UCHA, a State Actor at all times pertinent herein, via its policymakers, the CEO Elizabeth Concordia, its Chief Medical Officer (CMO) Margaret Reidy, MD, and the Colorado Department of Public Health & Environment, via its Executive Director, its Director of Health Facilities and Emergency Medical Services Division, and its Board Members for damages arising out of their unconstitutional, unlawful, malicious, unequal and contractually violative COVID-19 investigational drug mandate. Special laws apply to CDPHE's and CEO Concordia's vaccine mandates because the FDA defines the drugs at issue as "investigational with no license for any indication." And even though Defendants' mandates were instituted during and in response to a pandemic emergency, as the U.S. Supreme Court noted since the beginning of the pandemic: **"even in a pandemic, the Constitution cannot be put away and forgotten."** *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020).

**<u>TABLE OF CONTENTS</u>**

Description of Cause of Action                                                           2

Table of Contents                                                                        3

I.       Introduction                                                                    4

II.      Jurisdiction and Venue                                                          6

III.     Plaintiffs                                                                      7

IV.      Defendants                                                                      9

V.       History and Facts                                                              12

VI.      The Belmont Report                                                             14

VII.     45 CFR Part 46                                                                 16

VIII.    Legally Effective Informed Consent                                            20

IX.      COVID-19 Research Activities                                                  22

X.       ICCPR Treaty                                                                  30

XI.      21 U.S.C. §360bbb-3 (aka Section 564)                                         33

XII.     HHS EUA Precedent                                                             39

XIII.    Judicial EUA Precedent                                                        40

XIV.     Federal Wide Assurance (FWA)                                                  41

XV.      PREP Act & 21 U.S.C. §360bbb-3 (EUA Statute) – Preemption of State Law        44

XVI.     CDC Covid-19 Vaccination Program Provider Agreement                           50

XVII.    Statement of Facts                                                            54

XIX.     Legal Claims                                                                  81

Count One: 42 U.S.C. § 1983 – Deprivation of Legally Effective Informed Consent         82

Count Two: 42 U.S.C. § 1983 – Deprivation of Equal Protection Rights                    84

Count Three: 42 U.S.C. § 1983 – Deprivation of Due Process Rights     85

Count Four: 42 U.S.C. §1983-Deprivation of Rights Under the Spending Clause     87

Count Five – Unconstitutional Conditions Doctrine – 42 U.S.C. § 1983     90

Count Six – PREP Act – 42 U.S.C. § 1983     92

Count Seven – Breach of Contract, Third Party Beneficiary     95

Count Eight – Colorado State Common Law Employment Torts     96

Count Nine – Extreme and Outrageous Conduct     98

Count Ten – Implied Private Right of Action 21 U.S.C. §360bbb-3     98

XX.    Damages Recoverable and Demanded     99

XXI.    Jury Trial Demand     100

## I.  Introduction

1.  In early 2020, the nation and the world faced a novel coronavirus called SARS-CoV-2, which caused the highly contagious disease COVID-19.

2.  On January 31, 2020, the Secretary of Health and Human Services (HHS) declared a public health emergency. The President declared a national emergency on March 13, 2020, of which led to the development of investigational new drugs designed to perform as a vaccine from the virus, i.e., cause the body to produce antibodies to the virus so that the person is immune from infection when exposed to the true virus.

3.  To implement the nationwide distribution and administration of these investigational new drugs, the U.S. Food and Drug Administration (FDA) issued an Emergency Use Authorization pursuant to 21 U.S.C. 360bbb-3 (Section 564 of the Food, Drug & Cosmetic Act.)

4.  The FDA made clear on its website:

FDA believes that terms and conditions of an EUA issued under Section 564 preempt state or local law, both legislative requirement and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564…In an emergency, it is critical that the conditions that are part of the EUA or an order or waiver issued pursuant to section 564A – those that FDA has determined to be necessary or appropriate to protect public health – be strictly followed, and no additional conditions be imposed.

5.    In August 2020, the Centers for Disease Control (CDC) published the transcript of a meeting of the Advisory Committee on Immunizations and Respiratory Diseases, at which Dr. Amanda Cohn stated (@1:14:40):

I just wanted to add that, just wanted to remind everybody, that **under an Emergency Use Authorization, an EUA, vaccines are not allowed to be mandatory**. So, early in the vaccination phase, individuals will have to be **consented** and **they won't be able to be mandated.** (Emphasis added)

6.    In July of 2021, the CDPHE usurped the authority of the United States Congress by issuing an official proclamation in defiance of federal law when it mandated the use of investigational new drugs by healthcare workers.  Additionally, the CDPHE engaged in outrageous tyrannical conduct by mandating that healthcare facilities deny employment to healthcare workers who exercised their federally secured right to refuse investigational drugs.

7.    UCHA, UCHealth CEO Elizabeth Concordia, as UCHealth's policymaker, and CMO Margaret Reidy, MD, decided that the suffering of the few was justified by the windfall such suffering had on UCHealth's financial bottom line. Thus, UCHealth prescribed its own "required conditions" in defiance of Congress and the rights of individuals under Defendants' authority as secured by the Constitution.

8.    In July 2021, CEO Concordia issued a despicable illegal mandate that shocked the conscience. During the height of the pandemic, when hospitalization rates soared, and SARS-CoV-2 variants abounded, and in direct contravention to federal law governing investigational drugs,

CEO Concordia subjected "a workforce of more than 30,000 people" to investigational drug use under threat of penalty and outside of their free will and voluntary consent. Should those individuals not comply with CEO Concordia's fraudulent usurpation of authority, they would be segregated, penalized, humiliated, terminated, and denied unemployment benefits, thus depriving Plaintiffs of their Constitutional and federally secured right to refuse an investigational drug without penalty.

9.     The CDPHE used its office as official cover in hopes of obtaining for itself immunity from liability in future legal actions. Similarly, attempting to hide behind the PREP Act as a liability cover, UCHA and UCHealth, its policymaker, CEO Concordia and CMO Reidy willfully chose to engage in violations of federal law.

## II.     Jurisdiction and Venue

10.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.     The civil rights portions of this action raise federal questions under the Spending Clause and the Fourteenth Amendment to the U.S. Constitution.

12.     This Court has original jurisdiction under 42 U.S.C. §§ 1983 and 1988.

13.     This Court has the authority to award costs and reasonable attorney's fees under 42 U.S.C. § 1988.

14.      This court has supplemental jurisdiction over Plaintiffs' state law claims.

15.     This Court has personal jurisdiction over Defendants as they are domiciled within this Court's jurisdictional boundaries.

16.     This Court has subject matter jurisdiction over the parties because all acts complained of herein were committed by Defendants in the State of Colorado and caused damage and/or deprivation to the Plaintiffs listed herein.

17.     Venue is proper in this court because all events underlying the claims in this Complaint occurred in the State of Colorado, which is situated within this Court's jurisdiction, and all Defendants reside in the State of Colorado.

### III.     Plaintiffs

18.     The following individuals are plaintiffs herein:

18.1.   Plaintiff, Jessica Sweeney, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.2.   Plaintiff, Roxie Blue, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.3.   Plaintiff, Erika Bode, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.4.   Plaintiff, Amber Cano, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.5.   Plaintiff, Julie Deters-Frank, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.6    Plaintiff, Karen Donelson, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.7.    Plaintiff, Jennifer Eddins, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.8.    Plaintiff, Polly Goodwin, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.9.    Plaintiff, Gabriel Hergenreter, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.10.   Plaintiff, Mary Lou Howard, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.11.   Plaintiff, Gwenn Hren, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.12.   Plaintiff, John Lansford, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.13.   Plaintiff, Jaime Montgomery, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.14.   Plaintiff, Erin Phipps, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in

Colorado.

18.15. Plaintiff, Kinga Shelton, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.16. Plaintiff, Stephanie Silvers, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.17. Plaintiff, Patricia Spoerl, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.18. Plaintiff, Loni Thalheimer, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.19. Plaintiff, Alisha Torbeck, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

## IV.     Defendants

19.    The following are named as defendants herein:

19.1.    Defendant, University of Colorado Hospital Authority ("UCHA") is a political subdivision of the State of Colorado that formed a joint venture with the non-profit company Poudre Valley Medical Group, LLC, called UCHealth Medical Group. UCHA is a body corporate and political subdivision of the State of Colorado pursuant to C.R.S. § 23-21-503. UCHealth Medical Group is wholly owned by Poudre Valley Health Care Inc., d/b/a Poudre

Valley Health System ("PVHS"). Together, UCHA and PVHS formed University of Colorado Health (UCHealth), a Colorado non-profit corporation. All of these entities operate under the umbrella of "UCHealth," but Plaintiffs were employed expressly with the University of Colorado Hospital Authority (UCHA). Because UCHA and UCHealth are alter egos of one another and any and all actions alleged herein against one are alleged against the other.

19.2.    Defendant, Elizabeth Concordia, was at all times pertinent the President and Chief Executive Officer of UCHealth. Ms. Concordia is named as a defendant in her official and individual capacities.

19.3.    Defendant, Margaret Reidy, MD, was at all times pertinent the Chief Medical Officer of UCHealth and a signatory to the CDC Vaccine Program Provider Agreement on behalf of herself and UCHealth. Dr. Reidy is named as a defendant in her official and individual capacities.

19.4.    Defendant, Michael Randle, MD, was at all times pertinent the Chief Executive Officer of UCHealth Medical Group and a signatory to the CDC Vaccine Program Provider Agreement on behalf of himself and UCHealth. Mr. Randle is named as a defendant in his official and individual capacities.[1]

19.5.    Defendant, Jill Hunsaker Ryan, was at all times pertinent the Executive Director of the Colorado Department of Public Health & Environment (CDPHE). Ms. Ryan is named as a defendant in her official and individual capacities.

19.6.    Defendant, D. Randy Kuykendall, was at all times pertinent the Director of Health Facilities and Emergency Medical Services Division of the Colorado Department of Public Health & Environment.  Mr. Kuykendall is named as a defendant in his official and individual

---

[1] Elizabeth Concordia, Michael Randle, Margaret Reidy, and UCHA are collectively referred to as "UCHA Defendants."

capacities.

19.7.    **Defendant,** Patricia Hammond, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.8.    **Defendant,** Raymond Estacio, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.9.    **Defendant,** Daniel Pastula, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.10.  **Defendant,** Sean Turk, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.11.  **Defendant,** Tom Butts, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.12.  **Defendant,** Evelinn Borrayo, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules

related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.13. **Defendant,** Kendall Alexander, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.[2]

## V. History and Facts

20. Plaintiffs make no assertions regarding whether it is lawful for a public or private entity to mandate taking a ***licensed*** vaccine. Plaintiffs' allegations herein only relate to Defendants' mandating the use of drugs, biologics, and devices under 21 U.S.C. §360bbb-3 and the PREP Act.

21. Plaintiffs adamantly assert that an individual has the absolute Constitutional and federally secured right to refuse the administration of an Emergency Use Authorization (EUA) drug (e.g., Pfizer BioNTech COVID-19 Vaccine), biologic, or device (e.g., EUA testing articles and masks) or a "covered countermeasure" under PREP Act immunity without incurring a penalty or losing a benefit to which they are otherwise entitled and that such a right is not dependent upon a person seeking a religious or medical exemption.

22. Because the EUA statute was created to allow the Secretary of HHS to authorize the use of a product for a purpose for which it is not already licensed, 21 U.S.C. §360bbb-3 products fall under the investigational or experimental classification by statute.[3]

---

[2] Jill Hunsaker Ryan, D. Randy Kuykendall, and the individual members of the Board of Health are collectively referred to as "CDPHE Defendants."

[3] 21 U.S.C. §360bbb-3(a)(2)(A) and (B)

23.     This classification was illustrated in the May 10, 2021, Scope of Authorization letter issued to Pfizer, Inc. wherein the FDA advised Pfizer that its product is "an investigational vaccine not licensed for any indication." The same is true for the Moderna and Jannsen injections.

24.     Because EUA products are, by definition, used only during times of emergency, the laws regulating these products are not litigated as much as more commonly used statutes, so a brief recitation of the origin and history of these laws should prove helpful.

25.     The laws regulating the investigational new drug (IND) industry were largely created after Senator Edward Kennedy held live hearings in 1973 detailing the industry's abuses against the American people. In 1974, Congress enacted the National Research Act[4] in response to those hearings, establishing laws, regulations, and mandatory guidelines to protect Americans from future abuses. However, the industry has been internally regulated and enforced via various federal and state agencies since 1974.  This internal enforcement has denied the judiciary from acquiring knowledge of the laws discussed herein. To ensure Plaintiffs secure equitable justice, the court is provided with an understanding of those laws that have been so well hidden from so many people during the COVID-19 pandemic.

26.     The 1974 National Research Act established the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research[5] (hereinafter referred to as the "Commission").

27.     Congress required the Commission to:

    A.    "conduct a comprehensive investigation and study to identify the basic ethical principles which should underlie the conduct of biomedical and behavioral research involving human subjects,"

---

[4] Public Law 93-348-July 12, 1974 National Research Act
[5] Title II of the National Research Act - https://www.govinfo.gov/content/pkg/STATUTE-88/pdf/STATUTE-88-Pg342.pdf

B. "develop guidelines which should be followed in such research to assure that it is conducted in accordance with such principles," and

C. "make recommendations to the [HHS] Secretary" for "such administrative action as may be appropriate to apply such guidelines to biomedical and behavioral research conducted or supported under programs administered by the Secretary."

28. Congress further required the Commission to consider "the nature and definition of informed consent in various research settings."[6]

29. On April 18, 1979, the Commission published its findings in the Federal Register in a report titled, "The Belmont Report."[7]

## VI.  The Belmont Report

30. The Belmont Report outlined what the Commission considered "the nature and definition of informed consent" as follows:

A. "An autonomous person is an individual capable of deliberation about personal goals and acting under the direction of such deliberation. To respect autonomy is to give weight to autonomous persons 'considered opinions and choices while refraining from obstructing their actions…" (Emphasis added);

B. "To show lack of Respect for an autonomous agent is to repudiate that person's considered judgments, to deny an individual the freedom to act on those considered judgments…"(Emphasis added);

C. "Respect for persons requires subjects, to the degree that they are capable, be given the opportunity to choose what shall or shall not happen to them. This opportunity is provided when adequate standards for informed consent are satisfied" (Emphasis added).

---

[6] National Research Act Title II - PROTECTION OF HUMAN SUBJECTS OF BIOMEDICAL AND BEHAVORIAL RESEARCH Part A Section 202. (a)(1)(B)(iv)
[7] The National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. - Belmont Report. Colorado, DC: U.S. Department of Health and Human Services,1979

31.     The Belmont Report defined those adequate standards of informed consent as follows:

  A.  An agreement to participate in research constitutes valid consent <u>only if voluntarily given</u>. <u>This element</u> of informed consent <u>requires conditions free of coercion and undue influence</u>; (Emphasis added)

  B.  Coercion occurs when an overt threat of harm is intentionally presented by one person to another in order to obtain compliance;

  C.  Undue influence, by contrast, occurs through an offer of an excessive, unwarranted, inappropriate, or improper reward or other overture in order to obtain compliance. Also, inducements that would ordinarily be acceptable may become undue influences if the subject is especially vulnerable;

  D.  Unjustifiable pressures usually occur when persons in positions of authority or commanding influence -- <u>especially where possible sanctions are involved</u> -- urge a course of action for a subject," (emphasis added), and;

  E.  …undue influence would include actions such as manipulating a person's choice through the controlling influence of a close relative and threatening to withdraw health services to which an individual would otherwise be entitled.

32.     The Commission determined that if an individual is under outside pressure to participate in an investigational medical activity, then obtaining that individual's informed consent was legally impossible.

33.     Congress mandated in the National Research Act that "[i]f the Secretary determines that administrative action recommended by the Commission should be undertaken by him, he shall undertake such action as expeditiously as is feasible."

34.     Congress required the HHS Secretary to act upon the Commission's recommendations as outlined in the Belmont Report by establishing regulations to protect humans

involved in biomedical research activities. **Therefore, given the complexity, the intent of Congress was not to draft those laws but to allow the HHS Secretary to promulgate regulations on its behalf** to protect humans involved with investigational drugs. Therefore, these regulations are unique in that they were expressly requested by Congress to fulfill the intent of Congress via the National Research Act.

35.      In the early 1980s, HHS acted upon the Commission's recommendations, stating, "Based on the Belmont Report and other work of the National Commission, HHS revised and expanded its regulations for protecting human subjects…The HHS regulations are codified at 45 Code of Federal Regulations (CFR) 46, subparts A through D."[8]

## VII.   45 CFR Part 46

36.      45 CFR Part 46 is entitled, "Protection of Human Subjects." Subpart A is entitled, "Basic HHS Policy for Protection of Human Research Subjects" and establishes that (a) the policy (for protection of human research subjects) "applies to **all research**[9] involving human subjects conducted, supported, or otherwise subject to regulation by any Federal department or agency..." (Emphasis added).[10]

37.      HHS designed a very broad definition of research when, at 45 CFR § 46.102 (Definitions): "Research means a systematic investigation, including research development, testing, and evaluation, designed to develop or contribute to generalizable knowledge. Activities

---

[8] 45 CFR 46 FAQs. HHS.gov. Published 2018. Accessed May 18, 2023.
https://www.hhs.gov/ohrp/regulations-and-policy/guidance/faq/45-cfr-46/index.html
[9] Research under 45 CFR Part 46 includes clinical trials but is not limited in scope to only clinical trials. College students studying medical charts of patients constitutes "research" requiring 45 CFR Part 46 adherence.
[10] 45 CFR 46.101(a)

that meet this definition constitute research for purposes of this policy, <u>whether or not</u> they are conducted or supported under a program that is considered research for other purposes"[11] (emphasis added). Research under this policy includes medical chart reviews by students or periodic studies of medical products under 21 U.S.C. §360bb-3 authorization.[12]

38.     A "human subject" is broadly defined as (1) a living individual, (2) from whom data is obtained and used,[13] and (3) from whom identifiable private information is known.[14]

39.     HHS regulations define[15] the term "human subject" at 45 CFR 46.102(e) as follows:

(1) ***Human subject*** means a living individual about whom an investigator (whether professional or student) conducting research:

    (i) Obtains information or biospecimens through intervention or interaction with the individual, and, uses, studies, or analyzes the information or biospecimens; or

    (ii) Obtains, uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens.

(2) ***Intervention*** includes physical procedures by which information or biospecimens are gathered (*e.g.,* venipuncture) and manipulations of the subject or the subject's environment that are performed for research purposes.

(3) ***Interaction*** includes communication or interpersonal contact between investigator and subject.

(4) ***Private information*** includes information about behavior that occurs in a context in which an individual can reasonably expect that no observation or recording is taking place, and information that has been provided for specific purposes by an individual and that the individual can reasonably expect will not be made public (e.g., a medical record).

---

[11] 45 CFR 46.102(l)
[12] https://www.hhs.gov/ohrp/sites/default/files/human-subject-regulations-decision-charts-2018-requirements.pdf
[13] 45 CFR 46.102(e)(1)(i)
[14] 45 CFR 46.102(e)(1)(ii)
[15] "Coded Private Information or Biospecimens Used in Research (2018)." HHS.gov. Published January 19, 2018. https://www.hhs.gov/ohrp/coded-private-information-or-biospecimens-used-research.html#:~:text=Identifiable%20private%20information%20is%20private,is%20associated%20with%20the%20information (Last accessed June 5, 2023)

(5) ***Identifiable private information*** is private information for which the identity of the subject is or may readily be ascertained by the investigator or is associated with the information.

(6) ***An identifiable biospecimen*** is a biospecimen for which the identity of the subject is or may readily be ascertained by the investigator or is associated with the biospecimen. (Emphasis in original.)

40.     Congress drafted broad definitions for "research" and "subjects" to comply with the recommendations of the Belmont Report, which declared that "the general rule is that if there is any element of research in an activity, that activity should undergo review (third-party review to ensure the health and rights of involved individuals are protected) for the protection of human subjects"[16] (emphasis added).

41.     Therefore, if individuals are administered an investigational medical product and their private identifiable information is collected along with the details about their interaction with the product, and that information is monitored, studied, or analyzed for purposes of adding to the generalizable knowledge of the product, then the activity meets the definition of "research," requiring 45 CFR Part 46 compliance when the federal government is involved.

42.     HHS ensured that all research activities involving the federal government must comply with Belmont Report's ethical requirements: (1) "Department or agency heads retain final judgment as to whether a particular activity is covered by this policy, and this judgment shall be exercised consistent with the ethical principles of the Belmont Report"[17] (emphasis added), (2) if

---

[16] The Belmont Report Part A: Boundaries Between Practice & Research. "Research and practice may be carried on together when research is designed to evaluate the safety and efficacy of a therapy. This need not cause any confusion regarding whether or not the activity requires review; the general rule is that if there is any element of research in an activity, that activity should undergo review for the protection of human subjects."
[17] 45 CFR § 46.101(c)

the activity is considered exempt from the policy, then "the alternative procedures to be followed are consistent with the principles of the Belmont Report."[18]

43.    Congress expressly prohibits the federal government from administering an investigational product to an individual without complying with the Belmont Report's ethical principles and 45 CFR § 46.101, et *seq*.

44.    Placing an individual under a "sanction" for refusing an EUA drug, biologic, or device patently violates the ethical principles of the Belmont Report.

45.    The intent of Congress was to give the Belmont Report the force of law through 45 CFR § 46.101, et *seq*. and the Federal Wide Assurance agreement (see discussion, *infra*) for the explicit purpose of protecting humans when they are offered a federally funded EUA investigational product.

46.    To further protect Americans from medical research abuses in the future, Congress declared that, "Federal funds administered by a Federal department or agency may not be expended for research involving human subjects unless the requirements of this policy have been satisfied."[19] (45 CFR § 46.122)

47.    Moreover, Congress also prohibited the United States Military from abusing individuals again by enacting 10 U.S.C. § 980(a), which provides in pertinent part, "Funds appropriated to the Department of Defense may not be used for research involving a human being as an experimental subject unless — (1) the informed consent of the subject is obtained in advance."

---

[18] 45 CFR § 46.101(i)
[19] All COVID-19 EUA drugs and their administration have been fully funded by the federal government, requiring 45 CFR Part 46 adherence.

48.     Therefore, pursuant to 45 CFR § 46.101, et *seq*., "research" occurs when an individual is administered an investigational drug, the individual's private identifiable information is known, and data collected regarding their interaction with the drug is added to the generalizable knowledge about the drug.

49.     The COVID-19 CDC Vaccination Program is a research activity requiring 45 CFR § 46.101, et *seq*. compliance as well as each COVID-19 EUA's Scope of Authorization. (See *infra*)

50.     At no time may the federal government offer or administer an investigational medical product to an individual if their "legally effective informed consent" is not obtained in advance.

## VIII.   Legally Effective Informed Consent

51.     45 CFR § 46.116 sets forth the Belmont Report's "adequate standards" of informed consent[20], and they include, but are not limited to:

(a)(1)     Before involving a human subject in research covered by this policy, an investigator <u>shall obtain the legally effective informed consent</u> of the subject or the subject's legally authorized representative; (Emphasis added)

(a)(2)     An investigator shall seek informed consent <u>only under circumstances</u> that provide the prospective subject or the legally authorized representative sufficient opportunity to discuss and consider whether or not to participate and that minimize the possibility of coercion or undue influence; (Emphasis added)

(a)(3)     The information that is given to the subject or the legally authorized representative shall be in language understandable to the subject;

(a)(4)     The prospective subject or the legally authorized representative must be provided with the information that a reasonable person would want to have in order to make an informed decision about

---

[20] The Belmont Report and 45 CFR §46.116 contain the only definition for what Congress deems legally effective informed consent. Therefore, when statutes explicitly or implicitly mandate a person to give their legally effective informed consent, these definitions must be understood as the intent of Congress for compliance purposes.

whether to participate, and an opportunity to discuss that information;

(a)(5)    Informed consent must begin with a concise and focused presentation of the key information that is most likely to assist a prospective subject or legally authorized representative in understanding the reasons why one might or might not want to participate in the research;

(a)(6)    No informed consent may include any exculpatory language through which the subject or the legally authorized representative is made to waive or appear to waive any of the subject's legal rights;

(a)(7)    For research involving more than minimal risk, an explanation as to whether any compensation and an explanation as to whether any medical treatments are available if injury occurs…;"

(a)(8)    A statement that participation is voluntary, refusal to participate <u>will involve no penalty or loss of benefits to which the subject is otherwise entitled</u>, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled" (Emphasis added).

52.    Legally Effective Informed Consent, according to the Belmont Report, can be broken down into its basic formula as:

(1) the individual <u>must not be</u> under outside pressure to participate,

(2) the only reason an individual participates is that he or she believes the product may benefit their personal health goals, and

(3) the conditions of 1 and 2 are established before the individual participates in the investigational product.

53.    Only when authorities comply with 45 CFR § 46.101, et *seq.* and the ethical principles of the Belmont Report can an opportunity exist for an individual to give their legally effective informed consent according to 45 CFR § 46.116(a)(1).

54.    Informed Consent must be legally effective and prospective, according to HHS.

55.     45 CFR Part 46 applies to all federal agencies, departments, and the military (45 CFR § 46.101(a)). Additionally, twenty federal agencies incorporated 45 CFR Part 46 specifically into their regulatory framework.[21]

56.     Through the Federal Wide Assurance (FWA) agreement (see *infra*), all U.S. States and Territories (i.e., state health agencies have FWA agreements) have agreed to obtain the legally effective informed consent of individuals when involving them in investigational medical products.

57.     Consensual medical experimentation involving investigational medical products can only exist under conditions that ensure individuals are free from outside pressures to participate.

58.     Therefore, individuals have the explicit right to refuse an investigational drug, biologic, or device without incurring a penalty or loss of benefits to which they are otherwise entitled.

59.     When Defendants penalized Plaintiffs for refusing to inject a 21 U.S.C. §360bbb-3 investigational drug into their bodies, Defendants breached their fiduciary and statutory duties to obtain Plaintiffs' legally effective informed consent. (See, *infra*)

## IX.     COVID-19 Research Activities

60.     CDPHE and UCHA Defendants are in a symbiotic relationship to conduct 45 CFR § 46.101, et *seq*. research activities pertaining to COVID-19 EUA drugs, biologics, and devices on behalf of the federal government. Moreover, they are in a symbiotic relationship to obtain legally

---

[21] https://www.hhs.gov/ohrp/regulations-and-policy/regulations/common-rule/index.html

effective informed consent from individuals offered participation in those experimental medical products.

61.     The federal government's Executive Branch purchased all COVID-19 EUA drugs (see, *infra*) and, in conjunction with HHS[22] and the CDC, developed research activities that States and CDC Vaccination Program Providers must conduct on its behalf.

62.     Drugs, biologics, and devices authorized under 21 U.S.C. §360bbb-3 (see discussion, *infra*) are classified by the FDA as investigational (experimental)[23],[24] according to their labeling. They have no legal indication to treat, cure, or prevent any disease according to their labeling.

63.     Moreover, if a product is already licensed by the FDA for the intended use under the declared emergency, the FDA is prohibited from issuing an EUA. (21 U.S.C. §360bbb-3(c)(3))

64.     The only COVID-19 drugs made available to Plaintiffs are classified by the FDA as investigational new drugs. No FDA-licensed COVID-19 vaccines have been introduced into commerce for general commercial marketing since the declaration of the pandemic in March 2020, through the filing of this Complaint.

65.     A "marketed drug" is not the same as an "investigational drug."

---

[22] The EUA Scope of Authorization assigns research activities to the person acting on behalf of the manufacturer of the drug (the federal government who purchased all of the inventory), and to "emergency stakeholders," and "health care providers."

[23] Investigational new drug means, "A substance that has been tested in the laboratory and has been approved by the U.S. Food and Drug Administration (FDA) for testing in people…Also called experimental drug, IND, investigational agent, and investigational drug." NCI Dictionary of Cancer Terms. National Cancer Institute. Published 2023. Accessed June 25, 2023. https://www.cancer.gov/publications/dictionaries/cancer-terms/def/investigational-new-drug

[24] 21 CFR 312.3 21 CFR 312.3 (Definitions and Interpretations): See "Investigational new drug" and "Clinical investigation" Note that "clinical investigation" is distinct from "clinical trial." While all clinical trials are clinical investigations, not all clinical investigations are clinical trials.

66.     A "marketed drug" is one that is licensed by the FDA for general commercial marketing and approved with an indication and usage for the treatment of a particular disease, which, via federal statute, EUA medical countermeasure products must not be. (See 21 USC 355a, *et seq*, 21 USC 360bbb-3(a)(2)(a,b))

67.     Investigational new drugs are legally regulated entirely differently than licensed drugs. The FDA declared in its August 23, 2021 EUA to Pfizer that "Pfizer-BioNTech COVID-19 Vaccine" drug is legally distinct from its licensed "COMIRNATY" drug[25].

68.     The distinction lies within the drug's classifications as assigned to them by the FDA.  Those distinctions have <u>significant</u> legal consequences for the end user. (See discussion, *infra*)

69.     EUA drugs, by their statutory definitions, are not licensed by the FDA for general commercial marketing and have no legal indication to treat, cure, or prevent any known disease.

70.     Investigational drug "means a new drug or biological drug that is used in a clinical investigation." (21 CFR 312.3 "Investigational new drug")

71.     Clinical investigation "means any experiment in which a drug is administered or dispensed to, or used involving, one or more human subjects. For the purposes of this part, <u>an experiment is any use of a drug except for the use of a marketed drug in the course of medical practice</u>." (21 CFR 312.3 "Clinical investigation") (Emphasis added).

---

[25] See Exhibit B, FDA EUA Pfizer August 23, 2021

72.     Only the FDA is authorized by Congress to assign a drug, biologic, or device its classification for purposes of regulation.

73.     Drugs are governed by their classification according to their labeling and not by their formulation.

74.     Congress explicitly enacted laws governing investigational new drugs to prevent the executive branch from continuing its history of abusing the rights of individuals who participate in investigational medical products.

75.     On December 11, 2020, the FDA issued to Pfizer-BioNTech the first COVID-19 EUA for its investigational drug (officially named Pfizer-BioNTech COVID-19 Vaccine[26]), and the FDA confirmed that Pfizer's product "is an investigational vaccine not licensed for any indication."[27]

76.     On December 18, 2020, the FDA issued to ModernaTX, Inc., an EUA for its investigational drug (officially named Moderna COVID-19 Vaccine), and the FDA confirmed that Moderna's product "is an investigational vaccine not licensed for any indication."[28]

77.     On February 27, 2021, the FDA issued to Janssen Biotech, Inc., an EUA for its investigational drug (officially named Janssen COVID-19 Vaccine), and the FDA confirmed that Janssen's product "is an investigational vaccine not licensed for any indication."[29]

---

[26] *Id.* The FDA improperly allowed Pfizer to add the word "Vaccine" to its investigational name. The court should not confuse this name to mean the drug's legal indication. Pfizer-BioNTech COVID-19 Vaccine is an investigational drug having no legal indication to treat, cure, or prevent any known disease. The FDA classified the drug as an "investigational new drug."
[27] 86 Fed.Reg. 5200, Jan. 19, 2021
[28] 86 Fed.Reg. 5211, Jan. 19, 2021
[29] 86 Fed.Reg. 28608, May 27, 2021

78.     21 U.S.C. §360bbb-3 requires the Secretary of HHS to "[a]ppropriate conditions for the monitoring and reporting of adverse events associated with the emergency use of the product (research activity)."

79.     The Secretary establishes the conditions under which the research activities will occur in each EUA letter, known as the Scope of Authorization.

80.     As an example, on January 19, 2021[30] the Secretary established mandatory conditions that Pfizer and emergency stakeholders (distributors, manufacturers, etc.) must follow, which involve 45 CFR 46 research activities.

81.     Under the EUA's "Conditions of Authorization," the Secretary mandates in part:

* * *

F.      Pfizer Inc. will report to Vaccine Adverse Event Reporting System (VAERS):

- Serious adverse events
- Cases of Multisystem Inflammatory Syndrome in children and adults
- Cases of COVID-19 that result in hospitalization or death, that are reported to Pfizer, Inc.

G.      Pfizer Inc. must submit to Investigational New Drug application (IND) number 19736 periodic safety reports at monthly intervals, within 15 days after the last day of a month…Each periodic safety report is required to contain descriptive information which includes:

- A narrative summary and analysis of adverse events submitted during the reporting interval, including interval and cumulative counts by age groups, special populations

[30] Authorizations of Emergency Use of Two Biological Products During the COVID-19 Pandemic; Availability. Federal Register. Published January 19, 2021. Accessed June 7, 2023. https://www.federalregister.gov/documents/2021/01/19/2021-01022/authorizations-of-emergency-use-of-two-biological-products-during-the-covid-19-pandemic-availability

(e.g., pregnant women), and adverse events of special interest.
- Newly identified safety concerns in the interval.

* * *

N.     Pfizer Inc. will conduct post-authorization observational study(ies) to evaluate the association between Pfizer-BioNTech COVID-19 Vaccine and a pre-specified list of adverse events of special interest, along with deaths and hospitalizations, and severe COVID-19. The study population should include individuals administered the authorized Pfizer-BioNTech COVID-19 Vaccine under this EUA in the general U.S. population (16 years of age and older), populations of interest such as healthcare workers, pregnant women, immunocompromised individuals, subpopulations with specific comorbidities.

* * *

T.     Vaccination providers administering Pfizer-BioNTech COVID-19 Vaccine must report the following information…to VAERS…:

- Serious adverse events
- Cases of Multisystem Inflammatory Syndrome in children and adults
- Cases of COVID-19 that result in hospitalization or death

82.     VAERS reported 1,562,008 entries from December 2020 through May 26, 2023, including 35,272 deaths (1.6 per hour) and 263,462 (12.11 per hour) serious injuries. These numbers demonstrate historical entries for a drug and the vast involvement of the medical community to add to the "generalizable knowledge" of the product.

83.     Healthcare providers and Pfizer, Moderna, and Janssen must identify the person receiving the product, monitor their involvement with the product, and report whether or not they had an adverse reaction to the product for the express purpose of adding to the generalizable knowledge of the product.

84.     COVID-19 drug manufacturers and government agencies use collected data to add to the generalizable knowledge about the product.  These conditions meet 45 CFR 46, FWA, and the Belmont Report definitions of research activities.

85.     The CDC Provider Agreement (see discussion, *infra*), EUA authorizations, and CDC's Advisory Committee on Immunization Practices (ACIP) recommendations demonstrate how the nationwide COVID-19 vaccination program is to be systematically investigated.

86.     The federal government purchased all COVID-19 drugs and created the CDC COVID-19 Vaccination Provider Agreement for the administration of its property to individuals desiring to participate in the product. The Provider Agreement establishes additional research activities that Defendants must conduct on the government's behalf and "must administer COVID-19 Vaccine in accordance with all requirements and recommendations of CDC and CDC's Advisory Committee on Immunization Practices (ACIP)."

87.     ACIP's Morbidity and Mortality Weekly Report from September 2021 confirms that in addition to "initial clinical trial data, ACIP…considered…real-world vaccine effectiveness studies, and post-authorization vaccine safety monitoring," information came from entities that executed the CDC Vaccine Provider Agreement and submitted the below-described information because the ONLY way to have authority to administer the COVID-19 Vaccines is by executing the CDC Vaccine Provider Agreement.[31] The use of this information by ACIP demonstrates how the data collected "contributes to generalizable knowledge."

---

[31] ACIP, Morbidity and Mortality Weekly Report, "Use of Pfizer-BioNTech COVID-19 Vaccine in Persons Aged ≥ 16 Years: Recommendations of the Advisory Committee on Immunization Practices – United States, September 2021", Vol.70, No.38, p. 1344.

88.     The ACIP recommendations[32] referenced in Footnote 1 of the CDC Provider Agreement[33] instruct Defendants to:

> A.   Provide an EUA Fact Sheet to potential recipients before being administered the drug.
>
> B.   Counsel potential vaccine recipients about expected systemic and local reactogenicity.
>
> C.   Follow additional clinical considerations, including details of administration and use in special populations (e.g., persons who are pregnant or immunocompromised or who have severe allergies) based on advice from the CDC (https://www.cdc.gov/vaccines/covid-19/info-by-manufacturer/ pfizer/clinical-considerations.html)
>
> D.   Adverse events that occur in a recipient after receipt of COVID-19 vaccine should be reported to the Vaccine Adverse Events Reporting System (VAERS).
>
> E.   Report vaccination administration errors, serious adverse events, cases of multisystem inflammatory syndrome, and cases of COVID-19 that result in hospitalization or death after administration of COVID-19 vaccine under EUA.
>
> F.   Report any clinically significant adverse event, whether or not it is clear that a vaccine caused the adverse event.
>
> G.   Inform vaccine recipients about V-Safe, the CDC's vaccine safety monitoring system that the CDC says "helps us monitor the safety of COVID-19 vaccines for everyone."[34]

89.     The CDC Provider Agreement further instructs Defendants:

> A.   Within 24 hours of administering a dose of COVID-19 Vaccine, record in the vaccine recipient's record and report required information to the relevant state, local or territorial public health authority.

---

[32] *Id.*, at 1347.

[33] The CDC Provider Agreement, at p.2, makes the ACIP Recommendations mandatory by the following language: "This agreement expressly incorporates all recommendations, requirements, and other guidance that this agreement specifically identifies through footnoted weblinks. Organization must monitor such identified guidance for updates. Organization must comply with such updates." See Exhibit A, CDC COVID-19 Vaccination Program Provider Agreement (hereinafter "Provider Agreement").

[34] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/pdfs/v-safe-information-sheet-508c.pdf

B. Submit Vaccine-Administration Data through either (1) the immunization information system (IIS) of the state or local territorial jurisdiction or (2) another system designated by CDC according to CDC documentation and data requirements.

C. Organization must preserve the record for at least 3 years following vaccination, or longer if required by state, local, or territorial law. Such records must be available to any federal, state, local, or territorial public health department to the extent authorized by law.

D. Report the number of doses of COVID-19 Vaccine that were unused, spoiled, expired, or wasted as required by the relevant jurisdiction.

E. Provide a completed COVID-19 vaccination record card to every COVID-19 vaccine recipient.

90. Based on the detailed, organized, and methodical way HHS and the CDC structured the nationwide COVID-19 Vaccination Program, it meets the criteria for "a systematic investigation…designed to develop or contribute to generalizable knowledge."

91. It cannot be reasonably argued that the required research activities under each COVID-19 EUA's Scope of Authorization and the CDC COVID-19 Vaccination Program Provider Agreement do not meet the conditions requiring 45 CFR § 46.101, et *seq*. compliance.

## X. ICCPR Treaty

92. In 1992, the United States Senate ratified the International Covenant on Civil and Political Rights Treaty (ICCPR).[35] Article VII states, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation." (Emphasis added)

93. Subjected means to be under the rule of law by one's authority.

---

[35] Treaty Document 95-20 - INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS. (2023, May 19). https://www.congress.gov/treaty-document/95th-congress/20/all-info

94.     Free consent means to be free from outside pressures to participate.

95.     The U.S. Senate issued a resolution stating, "That the United States considers itself bound by Article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States."[36]

96.     The U.S. Senate considered it to be a violation of Article 7 of the ICCPR Treaty and the 5th Amendment's Due Process Clause if individuals were forced to forfeit liberty and property without due process for refusing medical experimentation. The Senate also considered it to be a violation of Article 7 of the ICCPR Treaty and the 14th Amendment's Equal Protection Clause when individuals who refused medical experimentation were treated differently than those who accepted medical experimentation.

97.     The United States Senate stated that Articles One through Twenty-Seven of the ICCPR Treaty are not "self-executing" but "that it is the view of the United States that States Party to the Covenant should, wherever possible, refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant."

98.     Treatment by authorities debasing an individual's liberty, autonomy, and human dignity for the express purpose of coercing that individual to surrender their Constitutional rights,

---

[36] See "Resolution" - Treaty Document 95-20 - INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS. Congress.gov. Published 2023. Accessed June 5, 2023. https://www.congress.gov/treaty-document/95th-congress/20/all-info

leading to feelings of fear, anguish, and inferiority, meets the international definition of cruel, inhumane, and degrading treatment or punishment.[37]

99.     Whereas the "United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment" treaty deals specifically with physical torture or the threat of physical torture, Article VII of the ICCPR Treaty speaks to the political actions of governments and the laws of governments leading to a loss of rights, safety, and liberty, or the feelings that such actions will lead to those losses.

100.     The UN Human Rights Committee spoke to Article IV of the ICCPR Treaty regarding the derogation of rights when states declare an emergency. "Article 4, paragraph 2, of the Covenant explicitly prescribes that no derogation from the following articles may be made: article 6 (right to life), article 7 (prohibition of torture or cruel, inhuman or degrading punishment, or of medical or scientific experimentation without consent.)"[38] (Emphasis added.)

101.     Article 4.2 of the ICCPR Treaty established the restriction of derogation of informed consent rights as a peremptory norm. Although Article VII of the ICCPR Treaty does not provide a private right of action, it is nonetheless enforceable under 42 U.S.C. § 1983 because the treaty contains unambiguous rights enforceable language specific to the individual involved in experimental medical products or processes.

---

[37] "Treatment that humiliates or debases an individual, showing a lack of respect for, or diminishing, their human dignity, or when it arouses feelings of fear, anguish or inferiority capable of breaking an individual's moral and physical resistance." - degrading treatment or punishment. Published 2023. Accessed June 6, 2023. https://home-affairs.ec.europa.eu/networks/european-migration-network-emn/emn-asylum-and-migration-glossary/glossary/degrading-treatment-or-punishment_en

[38] "No justification or extenuating circumstances may be invoked to excuse a violation of article 7 for any reasons, including those based on an order from a superior officer or public authority." - Human Rights Committee in its General Comment No. 20 on article 7 (A/44/40)

## XI.    21 U.S.C. §360bbb-3 (aka Section 564)

102.    Congress expressly prohibits any manufacturer from introducing into commerce a drug, biologic, or medical device not licensed by the FDA for general commercial marketing (21 U.S.C. §355(a)) to ensure individuals are not subjected to medical experimentation outside of their free consent and or harmed by medical products not effectively researched for safety and efficacy.

103.    Investigational drugs, biologics, and devices are strictly controlled by Congress. Only authorized persons may access, distribute, and administer the investigational products and only under the prescribed conditions established by Congress.

104.    However, over time, Congress recognized the need to allow individuals to access unlicensed products for emergency, compassionate, and educational purposes (also known as "expanded access protocols"). Therefore, Congress established 21 U.S. Code §360bbb *et seq*., titled "Expanded Access to Unapproved Therapies and Diagnostics."

105.    Numerous conditions must be met before the legal administration of products authorized pursuant to the section can occur. The overriding requirement, irrespective of the authorized expanded access protocol, is that the individual must give their legally effective informed consent, whether the consent is under written or verbal conditions.  This requirement means the authority sponsoring the product or acting on behalf of the sponsor must ensure the individual consenting to participate is under no outside pressure to do so.

106.    Making it patently clear of their intent to protect Individuals from medical research abuses, Congress enacted legislation prohibiting federal funding for research activities if the informed consent obtained from the individual is not legally effective nor prospective for the civilian (45 CFR § 46.122) and for the military (10 U.S.C. §980).

107.    The Food, Drug, and Cosmetic Act "FDCA"), 21 U.S.C §360bbb-3 authorizes the

HHS Secretary to grant emergency expanded access protocols to (1) FDA-licensed products for

unlicensed uses or (2) products the FDA has not licensed for general commercial marketing.

108.    Congress <u>requires</u> the HHS Secretary to establish "appropriate conditions designed

to ensure that individuals to whom the product is administered are informed" of:

> (ii)(II)   the significant known and potential benefits and risks of such use,
> and of the extent to which such benefits and risks are unknown;
>
> (ii)(III)  the option to accept or refuse administration of the product;
>
> (ii)(III)  the consequences, if any, of refusing administration of the
> product, and
>
> (ii)(III)  the alternatives to the product that are available and of their
> benefits and risks.[39]

109.    Informing the individual of the product risks, alternatives, benefits, and health

consequences provides that individual with the quality information required to give legally

effective informed consent.[40]

110.    Congress requires healthcare professionals to inform the individual of "the option

to accept or refuse administration of the product," meaning the healthcare professional is required

by Congress to inform the individual of his or her <u>legal rights</u> under 21 U.S.C. §360bbb-3 before

participating in the product or activity.

---

[39] 21 U.S.C. 360bbb-3(e)(1)(A)
[40] The requirements of informing the subject of risks, benefits, alternatives, and health consequences, and that the
Secretary has authorized the use of the investigational drug mirrors 45 CFR §46.116 requirements.

111.     A legal right is a power held by an individual resulting from a constitution, statute, regulation, or judicial precedent of which no other authority may interfere unless prescribed in law.

112.     There are two legal rights conferred upon individuals considering whether to participate in a Section 564 medical countermeasure product, which are (1) the right to **accept** a Section 564 medical product, and (2) the right to **refuse** to take or use a Section 564 medical product.

113.     The decision belongs exclusively to the individual, and it must be under conditions free of outside pressures. If individuals are under outside pressure to participate, then it is legally impossible for them to give their free consent; thus, their rights have been infringed upon.

114.     There are three specific persons upon whom Congress confers a right under 21 U.S.C. §360bbb-3, which are:

    A.    the HHS Secretary, who is empowered to authorize access to investigational drugs, biologics, or medical devices and the conditions under which that access can occur,

    B.    the healthcare professional who is authorized to inform the individual of their Section 564 legal rights and to administer Section 564 medical products, and

    C.    the individual who is authorized to accept or refuse Section 564 medical products.

115.     Congress established a required condition that "[w]ith respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section

as the Secretary finds necessary or appropriate to protect the public health." (21 USC 360bbb-3(e))

116.    Additionally, Congress conferred authority onto the Secretary so that he may "appropriate conditions on who may administer the product with respect to the emergency use of the product, and on the categories of individuals to whom, and the circumstances under which, the product may be administered with respect to such use."

117.    These "appropriate conditions" and the "circumstances" are outlined in the Emergency Use Authorization (EUA) letter issued to the manufacturer of the emergency medical countermeasure under the "Scope of Authorization."

118.    Therefore, the Scope of Authorization contained in each EUA letter has the force of law as it establishes the conditions under which the emergency activities can occur, prescribing duties for the manufacturer and rights of all persons involved in the administrative process of the product.

119.    The Secretary determined that the COVID-19 pandemic required healthcare workers to provide individuals contemplating the use of one of the EUA products with a drug fact sheet *before the product is administered* to act as a function of informed consent.  In other words, the Secretary thought it was practical that every person be afforded this right and, as such, mandated that requirement under the Scope of Authorization for each EUA.

120.    To ensure individuals are protected when they are offered EUA medical products, Congress was explicit in that "[n]othing in this section [21 U.S.C. 360bbb-3] provides the

Secretary <u>any authority to require any person to carry out any activity</u> that becomes lawful pursuant to an authorization under this section (21 U.S.C. 360bbb-3(l))." (Emphasis added)

121. For purposes of the case at bar, the "activity that becomes lawful pursuant to an authorization under this section" is the administration of the EUA COVID-19 investigational injections manufactured by Pfizer, Moderna, and Johnson & Johnson/Jannsen or the required use of EUA testing articles and masks.

122. Therefore, the Secretary may grant access to unlicensed medical products for use under the declared emergency, but the Secretary may not require any person to manufacture, distribute, store, administer, or receive the product.

123. The Secretary may not delegate his authority, so by extension, any person participating in a 21 U.S.C. §360bbb-3 activity is also restricted by Congress from requiring any other person to participate in "any activity that becomes lawful pursuant to an authorization under" 21 U.S.C. §360bbb-3.

124. **Congress, therefore, prohibits governments (e.g., governors, mayors, school boards) and voluntary participants (e.g., hospitals, manufacturers, doctors) from having the authority to require any person to participate in any 21 U.S.C. §360bbb-3 activity at any time, under any statute, regulation, or state policy or custom.**

125. The explicit purpose of this statutory restriction is to ensure that no person is under a "sanction," "coercion," "undue influence," or "unjustifiable pressure"[41] to participate. If individuals are under those pressures, then no federal funds could be expended for the

---

[41] The Belmont Report's conditions that would nullify legally effective informed consent.

administration of a COVID-19 EUA product, nor could any healthcare provider acting on behalf of the federal government obtain an individual's Legally Effective Informed Consent.

126.    The individual has the right to accept the product, and the healthcare professional has the authority to administer the product. Still, neither is required to act on the demands of the other. Congress established a guideline requiring both the healthcare professional and the individual to mutually agree to the process to meet the legal requirement of 21 U.S.C. §360bbb-3.

127.    The purpose of this requirement is to ensure that the individual receives a quality standard of healthcare even under emergency conditions because not everyone is a proper candidate to take or use an investigational medical countermeasure.

128.    Therefore, if the HHS Secretary is the only person authorized to establish the conditions under which persons can access 21 U.S.C. §360bbb-3 medical countermeasures and not even he can mandate participation, **then Defendants had no authority to amend the Scope of Authorization and require that which Congress prohibits**.

129.    Therefore, when Defendants established a policy requiring individuals under their authority to become vaccinated against the COVID-19 virus, they were required by federal law to ensure that (1) licensed products existed to meet the legal requirements of the mandate, and (2) Plaintiffs were to be informed that they were under no obligation to inject an unlicensed COVID-19 EUA investigational drug into their body, nor would they incur a penalty or lose a benefit when refusing to do so.  Defendants did neither.

## XII.    HHS EUA Precedent

130.    On January 28, 2005, HHS issued the first EUA[42] under its new Section 564 authority (i.e., 21 USC 360bbb-3). The military requested EUA protocols for Anthrax Vaccine Adsorbed (AVA), to be utilized by civilians and service members. HHS stated, "The issuance of this Authorization for the emergency use of AVA is the first time that the EUA authority is being used. FDA intends to explain clearly the reasons for each issuance, termination, or revocation of an EUA. The agency wishes to make its decision-making understandable to help ensure that members of the public, and particularly those individuals who may be eligible to receive a medical product authorized for emergency use, are informed about the basis of an EUA determination."

131.    HHS mandated that individuals participating in the AVA investigational product must be informed of the following statements:

A.    Individuals (service members and civilians) who refuse anthrax vaccination will not be punished. (Emphasis added)

B.    Refusal may not be grounds for any disciplinary action under the Uniform Code of Military Justice.

C.    Refusal may not be grounds for any adverse personnel action. Nor would either military or civilian personnel be considered non-deployable or processed for separation based on refusal of anthrax vaccination.

D.    There may be no penalty or loss of entitlement for refusing anthrax vaccination,

E.    This information shall read in the trifold brochure provided to potential vaccine recipients as follows: You may refuse anthrax vaccination under the EUA, and you will not be punished. No disciplinary action or adverse personnel action will be taken. You will not be processed for separation, and you will still be deployable.

---

[42] https://www.govinfo.gov/content/pkg/FR-2005-02-02/pdf/05-2028.pdf

There will be no penalty or loss of entitlement for refusing anthrax vaccination.[43]

132.     The explicit instructions in the EUA language directly relate to AVA's classification as an investigational new drug not licensed by the FDA for any legal indication.  Moreover, the language was designed to ensure that healthcare professionals could obtain the legally effective informed consent of the individual because it expressly informed the individual that no "sanction" would be imputed for refusal, thus nullifying all outside pressures to participate. No amendments to Section 564 have altered its requirements since HHS issued this first EUA.

133.     The reason HHS was crystal clear about an individual's right to refuse an investigational drug was to respect court orders and the express authority of individuals to choose the available statutory options.

### XIII.   Judicial EUA Precedent

134.     On October 27, 2004, U.S. District Court Judge Sullivan spoke to the individual's authority to refuse investigational drugs without consequence when he held in *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004), that:

A.     Congress has prohibited the administration of investigational drugs to service members without their consent. This Court will not permit the government to circumvent this requirement; and,

B.     Unless and until FDA properly classifies AVA [an anthrax vaccine] as a safe and effective drug for its intended use, an injunction shall remain in effect prohibiting defendants 'use of AVA on the basis that the vaccine is either a drug unapproved for its intended use or an investigational new drug within the meaning of 10 U.S.C. §1107. Accordingly, the involuntary anthrax vaccination program, <u>as applied to all persons</u>, is rendered illegal absent informed consent or a Presidential waiver." (Emphasis added.)

---

[43] Federal Register/Vol. 70, No. 21/Wednesday, February 2, 2005/Notices 5455 IV Conditions of Authorization

135.     Immediately upon Judge Sullivan's ruling, the Department of Defense ended all punitive activities against service members and civilian employees because the federal court affirmed the individual's statutory authority to refuse investigational drugs without consequence. Except for 10 U.S.C. § 1107, the laws leading Judge Sullivan to his ruling apply to individuals irrespective of civilian or military service. No laws have changed to negate Judge Sullivan's 2004 ruling.

136.     Judge Sullivan added clarity to the importance of what was argued before the court by stating: "The Court is persuaded that the right to bodily integrity and the importance of complying with legal requirements, even in the face of requirements that may potentially be inconvenient or burdensome, are among the highest public policy concerns one could articulate." *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004).

137.     *Doe* and the HHS provide judicial and administrative precedent affirming the right of individuals to refuse investigational products without incurring a penalty or losing a benefit to which they are otherwise entitled. Nothing in the law has changed to nullify that right since those precedents were firmly established.

## XIV.    Federal Wide Assurance (FWA)

138.     In 2001, HHS created the Office of Human Rights Protection (OHRP), which established the Federal Wide Assurance (FWA) agreement. The FWA is an agreement by entities conducting business with HHS to comply with 45 CFR 46 and the Belmont Report's ethical guidelines.

139.     HHS states, "The Federal Wide Assurance (FWA) is an assurance of compliance with the U.S. federal regulations for the protection of human subjects in research. It is approved

by the Office for Human Research Protections (OHRP) for all human subjects research conducted or supported by the U.S. Department of Health and Human Services (HHS). The FWA is also approved by OHRP for federal wide use, which means that other U.S. federal departments and agencies that have adopted the U.S. Federal Policy for the Protection of Human Subjects (also known as the Common Rule) may rely upon the FWA for the research they conduct or support. An FWA is the only type of assurance currently accepted and approved by OHRP. It is required whenever an Institution becomes engaged in human subjects research conducted or supported by any U.S. federal department or agency that has adopted the Common Rule…"[44]

140. The OHRP assigns an FWA identification number to entities (hereinafter referred to as "Contracting Provider") that fulfill application requirements. An FWA identification number is issued only after the legally binding agreement between the Contracting Provider and the United States government has been signed.

141. The FWA's main purpose is to benefit a third-party beneficiary because the FWA agreement authorizes the Contracting Provider to participate in federally funded programs involving humans with investigational drugs if, and only if, the Contracting Provider agrees to protect the health and legal rights of the third-party beneficiaries (i.e., humans who are administered investigational drugs, biologics, or devices under the research conditions described above).

142. The fact that the entire FWA agreement hinges upon the intended rights of third-party beneficiaries means that Contracting Providers have a fiduciary duty to the third-party beneficiaries under the terms of the FWA agreement.

---

[44] Office for Human Research Protections. Federal Wide Assurance Instructions. HHS.gov. Published January 7, 2011. Last accessed May 19, 2023.

143.     The intended benefit to the third-party beneficiary is the right to accept or refuse participation in investigational products, clinical trials, and other research activities without fearing consequences for refusal and to know that independent Institutional Review Boards will provide oversight, ensuring their health, safety, and rights are protected.

144.     Although the third-party beneficiaries are not signatories to the contract, they are the intended third-party beneficiaries of the agreement, and their rights were violated the moment Defendants penalized Plaintiffs for refusing to take EUA products (i.e., investigational drugs, and testing articles).

145.     The FWA agreement requires the Contracting Provider to ensure that no third-party beneficiary is under outside pressure to participate in an investigational drug, biologic, or medical device.

146.     The FWA agreement requires Defendants to assure potential participants that they will not incur a penalty or lose a benefit to which they are otherwise entitled when refusing participation.[45]

147.     The duty placed upon the Contracting Provider is owed to those who refuse as well as those who accept the administration of investigational drugs.

148.     Therefore, when Defendants punished Plaintiffs (third-party beneficiaries) for refusing the administration of an investigational drug, they:

> A.     activated the terms and conditions of the contract,
>
> B.     violated the terms of the contract, causing injury to the legal rights of the third-party beneficiary,

---

[45] "The Federal Wide Assurance (FWA) is the only type of assurance currently accepted and approved by OHRP. Through the FWA, an institution commits to HHS that it will comply with the requirements in the HHS Protection of Human Subjects regulations at 45 CFR part 46." - HHS.  45 CFR 46.116(b)(8) requires the individual to be informed they will not be penalized for refusing participation in a research activity.

C.      created a cause of action for breach of fiduciary duty in favor of the third-party beneficiary.

149.    The Fourteenth Amendment's Equal Protection Clause provides additional protections by requiring all persons involved in federally funded COVID-19 countermeasure programs to be treated equally before the law, irrespective of the chosen option.

## XV.    PREP Act & 21 U.S.C. §360bbb-3 (EUA Statute) – Preemption of State Law

150.    In 2005, Congress passed the Public Readiness and Emergency Preparedness Act, hereafter referred to as the PREP Act (42 USC 247d-6d and 42 USC 247d-6e), to provide immunities for persons volunteering for "covered" activities. In accordance therewith, the HHS Secretary issued a COVID-19 PREP Act declaration in February 2020.[46]

151.    The first provision of the PREP Act (42 USC 247d-6d) is entitled "Targeted liability protections for pandemic and epidemic products and security countermeasures."

152.    The second provision of the PREP Act (42 USC 247d-6e) is entitled "Covered countermeasure process."

153.    Congress expressly crafted language preempting state and local law conflicting with the PREP Act (42 USC 247d-6d(b)(8)), which provides, in pertinent part:

(8) Preemption of State law

During the effective period of a declaration under subsection (b)…no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—

(A) is different from, or is in conflict with, any requirement applicable under this section; and

(B) relates to the…administration…of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter, or under the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.].

---

[46] 85 FR 15198

154. Congress expressly established that participation in the administration of the covered countermeasure (i.e., any EUA COVID-19 investigational drug) shall be voluntary. Specifically, Congress stated the following at 42 USC 247d-6e(c), in pertinent part:

> (c) Voluntary program
>
> The Secretary shall ensure that a State, local, or Department of Health and Human Services plan to administer or use a covered countermeasure is consistent with any declaration under 247d–6d of this title…and that potential participants are educated with respect to contraindications, <u>the voluntary nature of the program</u>, and the availability of potential benefits and compensation under this part. [Emphasis added.]

155. The CDC COVID-19 Vaccination Provider Program exclusively utilizes "the relevant state, local, or territorial immunization's cooperative agreement with CDC" as the means to distribute the federal government's "covered countermeasure[s]" (COVID-19 EUA drugs) (see, *infra*).

156. Therefore, when the State voluntarily agreed to use its immunization program to distribute the federal government's property, it was required to ensure all participants were only involved under strictly voluntary conditions.

157. Congress informed the State that if it planned to "administer or use a covered countermeasure," then it may not "establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that…is different from, or is in conflict with…**any matter included in a requirement** applicable to the covered countermeasure under this section or any other provision of this chapter, or under the Federal Food, Drug, and Cosmetic Act."

158. One such **matter included in a requirement applicable to the covered countermeasure** is contained in 21 U.S.C. §360bbb-3 (the Emergency Use Authorization statute)

whereby Congress, in unambiguous rights-conferring language, conferred upon the individual considering participation in a "covered countermeasure" may choose to "accept" or "refuse" participation.[47]

159.    Therefore, by the express language of the PREP Act, and its incorporation of the option to choose contained in the EUA statute, and also based on the Supremacy Clause in the U.S. Constitution, any State laws, ordinances, regulations, or customs that are "different" from or in "conflict" with an individual's authority to freely choose to accept or refuse participation in the medical countermeasure are preempted.

160.    Therefore, States are preempted by Congress from mandating participation in a PREP Act "covered countermeasure."

161.    Similarly, the State and private employers in that State are prohibited from enforcing any at-will employment doctrine when employees refuse participation in a "covered countermeasure" because using the threat of penalty of loss of employment benefits, or even employment itself, "conflict[s]" with the employee's federally secured right to accept or refuse participation in the covered countermeasure (e.g., drugs, biologics, masks, testing articles, etc.) without consequence.[48]

162.    The purpose of informing the individual of "the significant known…risks of such use, and of the extent to which such benefits and risks"[49] and of "the alternatives to the product that is available and of their benefits and risks"[50] is because the individual is not only consenting to be *irreparably* injected with an investigational drug but to also participate in a legally binding agreement under the terms and conditions established by Congress.

---

[47] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)
[48] *Id.*
[49] (21 U.S.C. §360bbb-3(e)(1)(A)(ii)(II))
[50] (21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III))

163. Individuals who consent to receive one of the COVID-19 EUA investigational drugs must agree to the following terms and conditions, including but not limited to:

    A.    forfeiture of civil litigation rights resulting from injuries;[51]

    B.    allowing their private identifiable information to be collected and used for a variety of purposes by unknown persons;[52]

    C.    allowing their involvement with the EUA product to be cataloged by various persons for unknown purposes,

    D.    allowing the data collected about their adverse events to be utilized by researchers for unknown purposes and eternity,[53]

    E.    assuming greater risks to their safety, health, and legal rights.[54]

164. The FDA issued an opinion[55] regarding federal preemption of the State's authority to interfere with 21 U.S.C. §360bbb-3 (aka section 564):

> FDA anticipates that conflicts between federal and state law may arise when FDA acts under sections 564, 564A, and 564B if states have existing requirements governing the shipment, holding, dispensing, administration, or labeling of unapproved medical products or approved medical products for unapproved uses. Courts have stated that the Supremacy Clause of the U.S. Constitution can operate to nullify both state legislative requirements and state common-law duties. Under the legal principles of implied conflict preemption, courts have found state law preempted where it is impossible to comply with both federal and state law, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Consistent with this case law, section 4(a) of Executive Order 13132 states that "[a]gencies shall construe... a Federal statute to preempt State law only where the statute contains an express preemption provision or there is some other clear evidence that the Congress intended preemption of State law, or where the exercise of State authority

---

[51] PREP Act forfeits all civil actions for damages in most situations.

[52] Each EUA and/or the CDC COVID-19 Vaccination Program Provider Agreement requires manufacturers and/or emergency stakeholders to obtain private identifiable information.

[53] Each EUA and/or the CDC COVID-19 Vaccination Program Provider Agreement requires manufacturers and/or emergency stakeholders to monitor, report and study a variety of adverse reactions to EUA products.

[54] Section 564 (21 U.S.C. 360bbb-3) requires potential recipients to be made aware of the risks, alternatives, and the fact that the product is only authorized by the Secretary under emergency conditions. These elements provide potential recipients with the required information to make a quality and legally effective decision to consent. Therefore, consent means the individual agrees to assume more than minimal risk as defined above.

[55] "Emergency Use Authorization of Medical Products and Related Authorities," Section VII. U.S. Food and Drug Administration. Published 2022. Accessed June 6, 2023.
 https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities#preemption

conflicts with the exercise of Federal authority under the Federal statute." FDA states that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564. Similarly, an order or waiver issued under section 564A and pre-positioning under section 564B preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements related to the activity authorized under sections 564A or 564B. To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and "conflicts with the exercise of Federal authority under [§ 564]." The same rationale applies to an order or waiver issued under section 564A and pre-positioning of an MCM under section 564B. (Emphasis added)

165.    The Supreme Court has long held that "the test of applicability of state laws [conflicting with the Supremacy Clause] is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act."[56]

166.    21 U.S.C. §360bbb-3 and the PREP Act can only be executed by the United States HHS Secretary under the prescribed conditions established by Congress.

167.    The State and subordinate private parties may only participate in "covered countermeasures" and the use of 21 U.S.C. §360bbb-3 medical products by volunteering to adhere to the conditions established by the HHS Secretary under the respective statutes, which includes the federal statutory requirement to obtain Plaintiffs' legally effective informed consent when considering participation in programs authorized by the above statutes.

168.    If Defendants can punish Plaintiffs for *refusing* to participate in using a 21 U.S.C. §360bbb-3 product, they must also have the authority to punish Plaintiffs *accepting* the product.

---

[56] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236 (1947)

In such a scenario, one can easily see that Plaintiffs are damned if they accept and damned if they refuse because the option no longer belongs to the Plaintiffs; rather, it belongs to Defendants disagreeing with the Plaintiffs' choice. Granting Defendants that power deprives Plaintiffs of their Constitutional rights (Equal Protection of Laws and Due Process) and undermines the authority of Congress to determine the conditions under which access to unlicensed drugs, biologics, and devices can occur.

169. Moreover, should Defendants be allowed to interfere in the Federal Acts by penalizing Plaintiffs for refusing to participate, and Plaintiffs are injured, having no judicial recourse for remedy, then Plaintiffs are deprived of their Due Process rights resulting from the sustained losses of their injury. Should a person be informed of the risks of participating in a covered countermeasure and still choose to participate, resulting in injury, then courts are satisfied that their Due Process rights are not violated when denied judicial relief under the statute's immunity clauses because they were made aware of the risks and consequences prospectively.

170. This irrefutable fact is why Congress preempts the State and Defendants (as State Actors) from having any authority to interfere with the right of Plaintiffs to either accept or refuse participation in "medical countermeasures" under 21 U.S.C. §360bbb-3 and "covered countermeasures" under the PREP Act.

171. In the case at bar, Defendants' use of the state at-will employment doctrine to terminate Plaintiffs' employment as a penalty for refusing administration of an EUA investigational drug conflicts with the federal law's goal of ensuring that only truly willing participants are involved in the use of "covered countermeasures" and 21 U.S.C. §360bbb-3 medical products, and as a result of that conflict, the State's at-will employment doctrine is

preempted for purposes of the administration of those countermeasures. It is thereby inapplicable as a defense to Defendants' unlawful actions described herein by Plaintiffs.

### XVI.   CDC COVID-19 Vaccination Program Provider Agreement

172.    The Centers for Disease Control (CDC) states that "[a]t this time, **all COVID-19 vaccine in the United States has been purchased by the U.S. government** (USG) for administration exclusively by providers enrolled in the CDC COVID-19 Vaccination Program and remains U.S. government property until administered to the recipient. Only healthcare professionals enrolled through a health practice or organization as vaccination providers in the CDC COVID-19 Vaccination Program (and authorized entities engaged in shipment for the Program) are authorized to lawfully possess, distribute, deliver, administer, receive shipments of, or use USG-purchased COVID-19 vaccine. Other possession, distribution, delivery, administration, shipment receipt, or use of COVID-19 vaccine outside the parameters of the Program constitutes, at a minimum, theft under 18 U.S.C. § 641, and violation of other federal civil and criminal laws. Violators are subject to prosecution to the full extent of the law." [See Exhibit A, Provider Agreement]

173.    Although the program states it is a "Vaccination Program" (hereinafter referred to as "CDC Vaccination Program"), the federal government has not distributed any FDA-licensed COVID-19 vaccines. Instead, it has relied exclusively on unlicensed COVID-19 EUA drugs for the program's administration.

174.    Before the CDC accepts a person or entity as a Provider in the CDC Vaccination Program, that person or entity is required to sign the CDC COVID-19 Vaccination Program Provider Agreement (See Exhibit A, Provider Agreement).

175. The Provider Agreement informs the person or entity that, "Your Organization's chief medical officer (or equivalent) and chief executive officer (or chief fiduciary)—collectively, Responsible Officers—must complete and sign the CDC COVID-19 Vaccination Program Provider Requirements and Legal Agreement (Section A)" (See Exhibit A, Provider Agreement.)

176. The Provider Agreement requires the organization to assign a person or persons who will be under a legal obligation to ensure the program is carried out effectively, declaring, "For the purposes of this agreement, in addition to Organization, Responsible Officers named below will also be accountable for compliance with the conditions specified in this agreement. The individuals listed below must provide their signature after reviewing the agreement requirements."

177. "This program is a part of collaboration <u>under the relevant state, local, or territorial immunization's cooperative agreement with CDC</u>. To receive one or more of the publicly funded COVID-19 vaccines (COVID-19 Vaccine), constituent products, and ancillary supplies at no cost, Organization agrees that it will adhere to the following requirements…" (Emphasis added).

178. Therefore, the CDC clearly states that the Provider Agreement works in conjunction with "relevant state" and other municipality immunization agreements. This requirement denotes state action involving private parties acting in the capacity of a state actor.

179. HHS requires any entity conducting business with its organization to submit and be approved for a Federal Wide Assurance agreement (see discussion, *supra*) in advance of participating in any program involving humans with investigational drugs under its authority. The fact that the medical products in question are under an EUA does not exempt entities conducting business with HHS from first agreeing to obtain an FWA before participation. This fact is why the

CDC chose only to distribute the program via the State's existing immunization program. Each state already has an HHS FWA agreement in place.

180.　　The Executive Branch of the government is required to comply with 21 U.S.C. §360bbb-3's requirements and all other laws and regulations protecting humans involved in investigational medical products under emergency access protocols.

181.　　When the Executive Branch chose to purchase all COVID-19 vaccines (i.e., licensed and unlicensed COVID-19 drugs), it was required to ensure that all applicable laws associated with each drug's classification were adhered to by all volunteering participants.

182.　　The Executive Branch chose to establish the Provider Agreement as the mechanism to ensure those legal obligations were followed.

183.　　While the Provider Agreement does not replace the laws and regulations governing any EUA drug classification, it adds an extra layer of legal obligations required of volunteer participants.

184.　　The Provider Agreement requires that all volunteer participants:

A.　　"must provide an approved Emergency Use Authorization (EUA) fact sheet or vaccine information statement (VIS), as required, to each vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative,"

B.　　"Organization must report moderate and severe adverse events following vaccination to the Vaccine Adverse Event Reporting System (VAERS),"

C.　　"Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine,"

D.　　"Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws."

185.     The EUA Fact Sheet is required because the Executive Branch of the government is the sole sponsor of EUA products,[57] and federal law requires them to obtain the legally effective informed consent of each individual before the administration of the product. Moreover, the HHS Secretary requires each recipient to be given the Fact Sheet for each EUA COVID-19 investigational drug from which the federal branch of government cannot exempt itself. The required Fact Sheet acts as a function of the "informed consent" process for persons ascertaining whether or not they will participate in the EUA product.

186.     The Executive Branch is required to report adverse events as part of the government's COVID-19 Vaccination Program because federal law requires this of every EUA product, which the HHS Secretary echoed in each of the EUA letters issued to pharmaceutical companies. Moreover, the requirement to monitor, collect, and report, adverse reactions (research activities) from the drugs' use denotes how these products are governed by 45 CFR 46, requiring both IRB and Belmont Report compliance.

187.     The requirement that the "Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws" is because federal law declares:

> A.     "This policy does not affect any state or local laws or regulations (including tribal law passed by the official governing body of an American Indian or Alaska Native tribe) that may otherwise be applicable and that provide additional protections for human subjects" (45 CFR 46.101(f));
>
> B.     Additionally, federal law declares, "The informed consent requirements in this policy are not intended to preempt any applicable Federal, state, or local laws (including tribal laws passed by the official governing body of an American Indian or Alaska Native tribe) that require additional information to be disclosed in

---

[57] The Federal government chose to purchase and retain ownership of all EUA COVID-19 drugs. However, that ownership does not negate their legal obligations under Section 564.

order for informed consent to be legally effective" (45 CFR 46.116(i));

C.  This policy does not affect any foreign laws or regulations that may otherwise be applicable and that provide additional protections to human subjects of research (45 CFR 46.101(g)).

188.  The Provider Agreement required Defendants to acknowledge the law before acceptance, as follows: "By signing this form, I certify that all relevant officers, directors, employees, and agents of Organization involved in handling COVID-19 Vaccine understand and will comply with the agreement requirements listed above…" (Emphasis added)

189.  Therefore, State governments and their authorized private parties agreed to participate in a joint effort to conduct research activities and obtain the legally effective informed consent of individuals on behalf of the United States Government when signing the CDC COVID-19 Vaccination Program Provider Agreement.

## XVII.  Statement Of Facts

190.  At all times pertinent, Plaintiffs were employed as healthcare workers by UCHA. UCHA is vested with the authority and responsibility of managing the affairs, control, direction, and disposition of UCHealth and Poudre Valley Medical Group, LLC.

191.  At all times pertinent, Plaintiffs were licensed by the State of Colorado, having the authority to deny Plaintiffs the right to engage in employment in their chosen profession by depriving them of their respective State licenses.

192.  At all times pertinent, Defendants acted under color of state law.

193.  Defendants' actions described herein led to a deprivation of Plaintiffs' Constitutional and statutory rights, causing financial damages and severe emotional distress.

194.  On July 28, 2021, UCHA issued a new employment requirement stating in part:

(1) "In the same way that influenza vaccination has been mandated in past years, all employees, employed provider, appointed medical staff,

volunteers, students, vendors and contractors who come into our facilities will be required to be vaccinated against COVID-19 or receive a valid exemption from employee health. Everyone must be compliant with the policy by **October 1**. Being fully vaccinated means completing the full vaccination series (which includes two doses of the Pfizer or Moderna vaccines, or one dose of the J&J vaccine), or receiving an approved exemption."

(2) "If you believe that you have a valid medical or religious reason to decline vaccination, please visit the vaccine policy page on The Source to learn more and contact employee health. Importantly, anyone who receives an exemption will be required to wear a mask at all times in UCHealth facilities and be tested weekly for COVID-19."

(3) Here are important dates you should be aware of:

August 13 – Last day to get the first Pfizer vaccine dose to have time to get the second dose by September 3.

August 22 – Vaccination deadline to receive $500 bonus on Sept. 3, 2021 for anyone who did not receive the bonus on July 23.

September 3 – Any employees who are not in compliance with the UCHealth vaccine policy will receive notification of disciplinary action.

October 1 – Contractors, vendors and volunteers will not be allowed to enter UCHealth facilities unless they are in compliance with the vaccine policy.

October 31 – Any employees who remain out of compliance will face disciplinary action up to and including termination. [58]

195.    The requirement to wear a "mask" and engage in a "weekly test" required Plaintiffs to participate in the use of PREP Act and EUA products outside of their free consent in violation of their statutory rights and deprived their Equal Protection of Laws as guaranteed under the Fourteenth Amendment because the policy did not require the same activities of employees who agreed to participate in products authorized under one of the above statutes.

196.    On July 28th, 2021, and through the filing of this complaint, all COVID-19 drugs that the FDA has licensed and introduced into commerce have either been under 21 U.S.C.

---

[58] See Exhibit C, UCHealth COVID-19 Vaccine Mandate

§360bbb-3 or the PREP Act. Therefore, it is irrefutable that Defendants relied exclusively on 21 U.S.C. §360bbb-3 products for complying with its vaccine, testing, and masking mandates.

197. As of July 28th, 2021, the only COVID-19 drugs available to Defendants and Plaintiffs were classified by the FDA as investigational new drugs under 21 U.S.C. §360bbb-3 authorization (see paragraphs 75-78).

198. Investigational new drugs[59] (IND) have no FDA-licensed legal indication to treat, cure, or prevent any known disease and are experimental by their very nature.[60]

199. INDs are not FDA-licensed as "vaccines."

200. Therefore, it is an indisputable fact that UCHA's policy unlawfully required Plaintiffs to inject an unlicensed investigational new drug into their bodies before October 1, 2021, as a condition for Plaintiffs to avoid "fac[ing] disciplinary action up to and including termination" in their chosen healthcare profession.

201. Moreover, it is indisputable that Defendants misrepresented the classification of available drugs to Plaintiffs, never referred to the available drugs as investigational, and only referred to them as having an FDA-licensed classification as a vaccine. The purpose of these misrepresentations is that the laws associated with a drug's classification have significant legal ramifications for the Plaintiffs (see, *infra*), a fact Defendants hid from Plaintiffs to compel participation.

---

[59] Investigational drug "means a new drug or biological drug that is used in a clinical investigation." (21 CFR 312.3 "Investigational new drug") Clinical investigation "means any experiment in which a drug is administered or dispensed to, or used involving, one or more human subjects. For the purposes of this part, an experiment is any use of a drug except for the use of a marketed drug in the course of medical practice." (21 CFR 312.3 "Clinical investigation") (Emphasis added).

[60] Investigational new drug means, "A substance that has been tested in the laboratory and has been approved by the U.S. Food and Drug Administration (FDA) for testing in people…Also called experimental drug, IND, investigational agent, and investigational drug." NCI Dictionary of Cancer Terms. National Cancer Institute. Published 2023. Accessed June 25, 2023. https://www.cancer.gov/publications/dictionaries/cancer-terms/def/investigational-new-drug

202.     UCHA used its financial position to place Plaintiffs under moral duress[61] in hopes of causing them to surrender their Constitutional and statutory rights, as most other employees had already capitulated to that duress.

203.     Therefore, the policy was illegal because it required Plaintiffs to inject an unlicensed investigational drug into their bodies as a condition for continuing employment, to forego wearing a mask under PREP Act authority, and to forego unwanted medical examinations utilizing testing articles under 21 U.S.C. §360bbb-3 and the PREP Act.[62]

204.     The policy was illegal because it required Plaintiffs to seek an exemption to have the right to "decline" the product without consequence, a right they already possessed by federal statute.

205.     The policy breached UCHealth's CDC COVID-19 Vaccination Program Provider Agreement because it violated many of Plaintiffs' third-party beneficiary rights set forth in the Provider Agreement, such as the right to consider participation by obtaining medical counseling from participating providers without incurring a fee and the right to consider that participation without fearing or being subjected to "sanctions," "coercion," or "undue influence."[63]

206.     Before the CDC accepts an entity as a Provider in the CDC COVID-19 Vaccination Program, that entity, its CEO, and its Chief Medical Officer (or equivalent) must sign the CDC COVID-19 Vaccination Program Provider Agreement.

---

[61] Moral duress consists of imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessity or weakness of another. *Lafayette Dramatic Productions v. Ferentz*, 306 Mich. 193, 9 N.W.2d 57, 66; See also Black's Law Dictionary, Sixth Edition, p. 1008.

[62] The policy violated 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), 45 CFR § 46.116, 45 CFR § 46.122, the Belmont Report, Article VII of the ICCPR Treaty, 10 U.S.C. §980, CDC COVID-19 Vaccination Providers Program Agreement, Federal Wide Assurance Agreement.

[63] The CDC contract explicitly states that it requires adherence to 21 U.S.C. §360bbb-3, which must adhere to 45 CFR 46 and the Belmont Report because of the required medical research activities. Therefore, by extension, the provider must ensure that the Plaintiffs are not under outside pressures to participate in the CDC COVID-19 Vaccination Providers Program Agreement.

207.    The Provider Agreement informed UCHA that "Your Organization's chief medical officer (or equivalent) and chief executive officer (or chief fiduciary)—collectively, Responsible Officers—must complete and sign the CDC COVID-19 Vaccination Program Provider Requirements and Legal Agreement (Section A)"  (See Exhibit A, Provider Agreement.)

208.    The Provider Agreement requires the Organization to assign a person or persons who will be under a legal obligation to ensure the program is carried out effectively, declaring, "For the purposes of this agreement, in addition to Organization, Responsible Officers named below will also be accountable for compliance with the conditions specified in this agreement. The individuals listed below must provide their signature after reviewing the agreement requirements."

209.    The CDC informed UCHA that "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine."[64]

210.    One of the requirements of any EUA is the required condition of UCHA "to ensure that individuals to whom the product is administered are informed— of the option to accept or refuse administration of the product." See 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).

211.    As established by a valid act of Congress, this provision requires UCHA to inform Plaintiffs of their legal rights when considering participation in any medical countermeasure under 21 U.S.C. §360bbb-3. This legal requirement is mandatory before the administration of any medical countermeasure by UCHA. It is the primary means by which UCHA obtains Plaintiffs' legally effective informed consent because it informs Plaintiffs that they will not incur a penalty

---

[64] See 12(a) in the Provider Agreement.

or loss of benefits to which they are otherwise entitled[65] should they choose not to participate in the 21 U.S.C. §360bbb-3 countermeasure.

212.     Additionally, the CDC contract requires adherence to 21 U.S.C. §360bbb-3, which must adhere to 45 CFR § 46.101, *et seq.* and the Belmont Report because of the required medical research activities. Therefore, by extension, the Provider must ensure that Plaintiffs are not under outside pressures to participate in the CDC COVID-19 Vaccination Program as outlined in 45 CFR § 46.116 and the Belmont Report (informed consent).

213.     At all times pertinent, the UCHealth Defendants concealed Plaintiffs' legal rights under 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) in their COVID-19 vaccine policies. The purpose of the concealment was to cause Plaintiffs to surrender their Constitutional and statutory rights.

214.     UCHA, Ms. Concordia, Ms. Reidy, and Mr. Randle are legally sophisticated in the laws associated with investigational new drugs and knew in advance that individuals could not come under a mandate to inject an IND into their body as a condition to enjoy the privilege of the State, conduct commerce, or continue employment at UCHealth.

215.     UCHealth Defendants currently conduct an estimated 592 clinical investigations and trials,[66] all requiring Institutional Review Board review and adherence to 45 CFR § 46.101, *et seq.* and the Belmont Report.

216.     Many of UCHA's research projects utilize INDs requiring adherence to the same legal obligations, and for decades, UCHealth has used INDs in their various hospital departments in an attempt to treat life-threatening situations under the various expanded access protocols under 21 U.S.C. §360bbb *et seq.*

---

[65] 45 CFR § 46.116
[66] A quick search for "all" revealed 592 current studies. - Clinical trials. UCHealth. Published August 7, 2023. Accessed September 6, 2023. https://www.uchealth.org/clinical-trials/

217.     In light of their extensive knowledge and experience, when UCHealth Defendants referred to their policy as a "vaccination policy," they knew it was misleading because as of the date of the issuance of their "vaccination policy," no COVID-19 drug manufacturer had received a marketing license from the FDA, meaning the available COVID shots were investigational and subject to the consent requirements of the federal statutes discussed herein.

218.     Well before the COVID-19 pandemic began, UCHealth was assigned Federal Wide Assurance Agreement number 00023003 by HHS after UCHealth assured HHS that UCHealth would comply with 45 CFR § 46.101, *et seq.* and the Belmont Report when involving individuals with investigational medical products funded by federal dollars or issued under federal authority. This assurance means UCHealth promised not to place individuals under "sanctions," "coercion," "undue influence," or "unjustifiable pressures" to participate in the use of an investigational new drug, biologic, or device when federal funding or authority is involved.[67]

219.     Therefore, when UCHealth stated, "In the same way that influenza vaccination has been mandated in past years, all…who come into our facilities will be required to be vaccinated against COVID-19," it ignored its knowledge that an FDA-licensed influenza vaccine is subject to different laws than those that govern the use of drugs that are not licensed by the FDA, such as the COVID EUA investigational drugs, and misrepresented the truth to Plaintiffs, all with the goal of coercing them into capitulating to their demands.

220.     UCHealth is prohibited by Congress, its FWA agreement, 21 U.S.C. §360bbb-3, the PREP Act, Article VII of the ICCPR Treaty, its IRB, and its signed CDC COVID-19 Vaccination Program Provider Agreement from requiring any person to participate in any IND.

---

[67] The Belmont Report (informed consent), 45 CFR §46.116

221.     It is indisputable that on July 28, 2021, the FDA had not licensed any COVID-19 drug as a vaccine and that although the FDA has licensed two drugs as a vaccine against the Coronavirus, the manufacturers of those drugs (i.e., Pfizer-BioNTech, Moderna) refused to ship them.

222.     Therefore, either UCHealth has always mandated the use of INDs, or the only INDs it has ever mandated are the COVID-19 INDs, and it intentionally mispresented facts to the Plaintiffs in hopes of causing Plaintiffs confusion regarding their right to refuse an investigational new drug.

223.     Plaintiffs are accustomed to helping staff obtain informed consent from patients undergoing treatment with investigational new drugs, so the intentional misrepresentation of facts that the experimental drugs would be mandated "in the same way" as licensed drugs had always been was presented to Plaintiffs for the express purpose of causing them to unintentionally participate in the Federal Government's medical research activity, which is an outrageous act that shocks the conscience in modern society.

224.     21 U.S.C. §355(a) states that "no person shall introduce or deliver for introduction into interstate commerce any new drug unless an approval of an [FDA marketing] application." (Emphasis added).

225.     Congress carved out exemptions to the 21 U.S.C. §355(a) restriction under 21 U.S.C. §360bbb *et seq.*[68] The exemptions allow individuals access to unlicensed drugs and biologics under compassionate, educational, or emergency conditions.

---

[68] 21 U.S.C. §360bbb is titled, "Expanded Access to Unapproved Therapies and Diagnostics" and 21 U.S.C. §360bbb(a) states, "The Secretary may, under appropriate conditions determined by the Secretary, authorize the shipment of investigational drugs or investigational devices for the diagnosis, monitoring, or treatment of a serious disease or condition in emergency situations."

226.    Congress established **a required condition** before expanded access protocols could be issued under 21 U.S.C. §360bbb-3[69], "[w]ith respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), **shall**, for a person who carries out any activity for which the authorization is issued, **establish such conditions** on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health." (21 USC 360bbb-3(e)) (emphasis added)

227.    Congress also conferred authority onto the Secretary that he may "appropriate conditions on who may administer the product with respect to the emergency use of the product, and on the categories of individuals to whom, **and the circumstances under which**, the product may be administered with respect to such use." (21 U.S.C. §360bbb-3(e)(1)(B)(ii)) (Emphasis added).

228.    However, because all COVID-19 drug EUAs must comply with 45 CFR § 46.101, *et seq.*[70] and the Belmont Report, Congress informed UCHealth Defendants that "[n]othing in this section provides the Secretary **any authority to require any person to carry out any activity** that becomes lawful pursuant to an authorization under this section (21 U.S.C. 360bbb-3(l))" (Emphasis added).

229.    In other words, the HHS Secretary may grant expanded access to unlicensed investigational new drugs (Pfizer-BioNTech COVID-19 Vaccine). Still, the Secretary is not authorized to require any person to manufacture, distribute, administer, or receive the EUA

---

[69] There are various expanded access protocols offered under 21 U.S.C. §360bbb *et seq.* and 21 U.S.C. §360bbb-3 is unique in that it is granted for large populations only under the statute's prescribed conditions.

[70] 45 CFR §46.122 "Federal funds administered by a Federal department or agency may not be expended for research involving human subjects unless the requirements of this policy have been satisfied." "Research means a systematic investigation, including research development, testing, and evaluation, <u>designed to develop or contribute to generalizable knowledge</u>. Activities that meet this definition constitute research for purposes of this policy, <u>whether or not</u> they are conducted or supported under a program that is considered research for other purposes." - 45 CFR §46.102(1) (emphasis added)

product. Moreover, Congress did not authorize the HHS Secretary to delegate his authority to another person. By extension, UCHA's involvement in a 21 U.S.C. §360bbb-3 activity also restricts them from requiring anyone to participate, a fact they were intimate with.

230. This fact is why the CDC required UCHA and its executive leaders to sign its contract promising that it would abide by 21 U.S.C. §360bbb-3. UCHA cannot produce a treaty, statute, regulation, or contract providing it authority to mandate what Congress or the HHS Secretary prohibits.

231. The Supremacy Clause of the U.S. Constitution dictates that UCHA may not amend 21 U.S.C. §360bbb-3 to establish conditions contrary to that federal law.

232. The restriction by Congress that no person can require any other person to participate in medical countermeasures ensures that healthcare professionals have complete authority to provide a quality standard of care[71] to individuals considering participation because not every person is a quality candidate to participate in an IND. Therefore, medical professionals, not political bureaucrats or a company's human resources department, have the necessary medical knowledge to understand when and when not to administer an emergency medical countermeasure to a patient.

233. Moreover, the restriction of the HHS Secretary's authority ensures the Federal Government, as well as the State Government through the Provider Agreement, obtains the Plaintiffs' legally effective informed consent since no person can be penalized for refusing to participate.

---

[71] "The standard of care is the benchmark that determines whether professional obligations to patients have been met. Failure to meet the standard of care is negligence, which can carry significant consequences for clinicians." Vanderpool D. The Standard of Care. *Innovations in clinical neuroscience*. 2021;18(7-9):50-51. Accessed September 9, 2023.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8667701/#:~:text=The%20standard%20of%20care%20is,carry%20significant%20consequences%20for%20clinicians.

234. UCHA Defendants, acted under color of law when depriving Plaintiffs of their Constitutional and Statutory rights when issuing the COVID-19 vaccination policy through which the deprivations occurred.

235. UCHA Defendants are the policymakers that either developed the COVID-19 policy, issued the policy, enforced the policy, and or signed the CDC COVID-19 Vaccination Program Provider Agreement promising not to develop such a policy.

236. UCHA Defendants are responsible for ensuring compliance with UCHealth's Federal Wide Assurance and its Institutional Review Board legal obligations.

237. At all times pertinent, UCHA Defendants, acted on a State custom that allows persons in authority to ignore the federal statutory rights of individuals to refuse the administration of COVID-19 INDs without incurring a penalty or loss of benefits to which they are otherwise entitled.[72]

238. UCHA Defendants, acted on a State policy[73] (see, *infra*) mandating healthcare facilities to prohibit Plaintiffs from engaging in employment in their chosen profession should they

---

[72] The Supreme Court noted in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) that the "Petitioner will have established a claim under § 1983 for violation of her equal protection rights if she proves that she was refused service by respondent because of a state-enforced custom…" (emphasis added)

[73] Although UCHA is a political subdivision, Defendants might argue that their actions should not be considered state action. Therefore, Plaintiffs assert that at all times pertinent, UCHA was engaged in state action, acting under color of state law. As the court held in *Modaber v. Culpeper Memorial Hospital, Inc.,* 674 F.2d 1023 (4th Cir. 1982): "we must inquire 'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity that the action of the latter may fairly be treated as that of the State itself.'" *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); *accord, Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 157, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). In holding that a privately-owned utility's termination of service is not "state action", the Court in *Jackson* makes it clear that state involvement without state responsibility cannot establish this nexus. *See* 419 U.S. 358, 95 S.Ct. 457. A state becomes responsible for a private party's act if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest. It acts in an exclusively state capacity when it "exercises powers traditionally exclusively reserved to the state[,]" 419 U.S. 352, 95 S.Ct. 454; for the state's direct benefit when it shares the rewards and responsibilities of a private venture with the state, *see id.,* 357-58, 95 S.Ct. 456-57, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 723-24, 81 S.Ct. 856, 860-61, 6 L.Ed.2d 45 (1961); and at the state's specific behest when it does a particular act which the state has directed or encouraged."

refuse to inject an unlicensed investigational drug into their bodies outside of their free will and voluntary consent.[74]

239.    At all times pertinent, UCHA Defendants, knew that the State policy and their COVID-19 vaccination policy violated federal law, contractual agreements, and Plaintiffs' rights. However, choosing to conspire with the State for greed (COVID-19 Vaccination Program cash cow), UCHA Defendants willfully and with moral turpitude[75] deprived Plaintiffs of their Constitutional and statutory rights.

240.    Plaintiffs were required to wear a mask or participate in unwanted medical testing only because of choosing a federally secured right (21 U.S.C. §360bbb-3) with which UCHA Defendants disagreed, while other employees choosing to inject such drugs into their bodies were not required to test or wear a mask, violating Plaintiffs' Equal Protection of Laws as guaranteed to them under the Fourteenth Amendment.

241.    UCHA Defendants, did not provide Plaintiffs with either their substantive or procedural due process rights as guaranteed to them under the Fourteenth Amendment before depriving them of their liberty (freedom from masking and testing policies as enjoyed by other employees) and property (e.g., wages, benefits, retirement funds).

242.    At all times pertinent, UCHA Defendants refused to acknowledge Plaintiff's statutory rights to refuse mandated products without consequence, which nullified Due Process.

243.    UCHA Defendants engaged in significant coercive measures by allowing Plaintiffs to submit only for a religious or medical exemption via an online process under duress.

---

[74] "[T]o act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions." *Dennis v. Sparks*, 449 U.S. 24 (1980)

[75] "This phrase is used to describe the violation of decent, moral, and honest behavior and an act of depravity or vileness." Black's Law Dictionary 2nd Ed.

244.     The online process required Plaintiffs to check a box[76] indicating that they would "comply with UCHealth Vaccination Policy," which changed frequently, and that they "agree" to "wear a mask" if the exemption is granted.  Checking the box, however, was mandatory, and one could not submit an exemption without checking that box, yet UCHealth adamantly refused Plaintiffs any other means to submit an exemption. In other words, UCHealth created a coercive scheme that forced Plaintiffs to involuntarily agree to unconstitutional conditions to participate in UCHealth's exemption process. The process is a violation of federal statute because it discriminates against Plaintiffs' Fourteenth Amendment rights by requiring Plaintiffs to barter their rights as a condition to enjoy a privilege of the State. Moreover, UCHA and its Policymakers violated 21 U.S.C. §360bbb-3 via the process because it established participation conditions not authorized by Congress.

245.     Plaintiff Loni Thalheimer submitted a paper version of her UCHealth COVID-19 Vaccine Medical Exemption and Release Form along with a written religious exemption request.[77] Still, she was informed by UCHealth that she was not allowed to submit her exemptions outside of the online portal and that she could only submit one, not both.  Confused, Mrs. Thalheimer submitted her religious exemption online and then mailed in her medical exemption.

246.     Having personal knowledge of Mrs. Thalheimer's medical condition, her doctor issued an exemption, believing the COVID-19 drugs could have severe physical consequences for Mrs. Thalheimer's health, yet UCHealth refused to acknowledge the medical exemption because UCHA Defendants cared more about their agenda than Mrs. Thalheimer's rights, safety, and health, which they had a duty to protect.

---

[76] See Exhibit D, Online Acknowledgement Box.
[77] See Exhibit E, Affidavit of Loni Thalheimer.

247.     UCHealth informed Mrs. Thalheimer that they would only accept either a religious or a medical exemption, but not both, and only those exemptions submitted via the online portal requiring her to surrender her Constitutional and statutory rights before submitting said request.

248.     Therefore, not only did UCHA and its Policymakers fraudulently require that which Congress prohibits (i.e., injection of unlicensed drugs), but they also refused to accept a valid medical exemption from Mrs. Thalheimer's medical professional stating that the drug could cause Mrs. Thalheimer severe harm because she did not submit that exemption via the online portal which required her to agree to a deprivation of her Constitutional rights before having the right to submit. Although Mrs. Thalheimer mailed a medical exemption via a signed affidavit, UCHA ignored her medical condition with wanton disregard for her rights, safety, and health. Such tyrannical actions demonstrate outrageous conduct by which a normal person would be highly offended.

249.     UCHA Defendants, issued and enforced a COVID-19 vaccination policy to intentionally inflict emotional distress upon Plaintiffs – individuals who built their lives in Colorado and spent decades sweating, crying, and laboring over Colorado residents, providing life-saving medical care selflessly.

250.     Plaintiffs' dreams, goals, and financial futures depended upon UCHA complying with federal law and its contractual obligations regarding their employment. Still, Plaintiffs' aspirations were destroyed by UCHealth Defendants' moral, turpitude and complete and wanton disregard for the U.S. Constitution, their FWA and CDC COVID-19 Vaccination Program contractural duties, 21 U.S.C. §360bbb-3 protocols, and the ethical principles of the Belmont Report they pledged to abide by.

251. The COVID-19 INDs have caused historic numbers of severe adverse reactions of which Plaintiffs were first-hand witnesses, and UCHA's Policy caused Plaintiffs severe fear that they would either lose access to living wages or become victims of one of the COVID-19 drugs' adverse reactions, causing Plaintiffs to be angered by UCHA's Policymakers' willful and wanton disregard for Plaintiffs' rights, safety, and health.

252. Plaintiffs could not understand why UCHealth required informed consent from patients for COVID-19 drugs but not from them. Therefore, the anger over the loss of Constitutional rights and fear of losing their livelihoods, dreams, goals, and ability to work in their chosen profession caused Plaintiffs to experience life-altering emotional distress.

253. UCHA Defendants breached their duties under:

(1) Federal Wide Assurance agreement,

(2) institutional review board,

(3) 45 CFR § 46.101, *et seq.*,

(4) 21 U.S.C. §360bbb-3,

(5) the PREP Act,

(6) CDC COVID-19 Vaccination Program Provider Agreement,

(7) Article VII of the ICCPR Treaty,

(8) the Belmont Report, and

(9) for refusing to obtain Plaintiffs' legally effective informed consent.

254. UCHA Defendants deprived Plaintiffs of their Fourteenth Amendment rights to Equal Protection of Laws and Due Process.

255.     UCHA Defendants placed Plaintiffs under moral duress, undue influence, and unjustifiable pressures[78] when using their position of influence (financial and authority) to compel participation in an unlicensed drug outside of Plaintiffs' free will and voluntary consent, a most severe charge of moral turpitude that Congress has spent more than 50 years attempting to eradicate from the healthcare industry.

256.     UCHA Defendants issued a policy that placed Plaintiffs under moral duress to participate in a legally binding agreement outside of their free consent, having potentially severe legal consequences for Plaintiffs (see paragraph 163).

257.     The potential participation by Plaintiffs in the use of 21 U.S.C. §360bbb-3 and PREP Act drugs only offered via the CDC COVID-19 Vaccination Program was meant to financially benefit UCHA. UCHA unjustly enriched itself by misrepresenting its authority to company employees as if they had the legal authority to mandate participation in COVID-19 INDs despite never claiming that right for any other IND. Under fraudulent pretense, that mandate caused most employees to capitulate their Constitutional and statutory rights, unjustly enriching UCHA.

258.     To ensure maximum compliance with UCHA's unlawful vaccination policy, CEO Elizabeth Concordia applied maximum pressure on Plaintiffs to set them as an example to other employees considering their 21 U.S.C. §360bbb-3 rights because UCHA Defendants' attitude was that employees must obey illegal edicts or face the employment and benefits firing squad, Constitution be damned.

---

[78] UCHA unjustly enticed Plaintiffs to participate in the federal government's CDC COVID-19 Vaccination Program research activity by offering them $500 in bonus pay, which violates legally effective informed consent requirements. "Unjustifiable pressures usually occur when persons in positions of authority or commanding influence -- especially where possible sanctions are involved -- urge a course of action for a subject." - The Belmont Report

259. UCHA Defendants issued a policy unlawfully mandating that Plaintiffs inject an unlicensed drug under 21 U.S.C. §360bbb-3 and the PREP Act into their bodies, and if they refused, they must wear a mask and take tests as a form of punishment.

260. Then, once **CDPHE issued its policy mandating that UCHA terminate the employment of any person refusing to inject an unlicensed drug into their body**, UCHA utilized that policy to financially destroy the lives of Plaintiffs by depriving them of living wages.

261. UCHA had contracts, agreements, and federal laws to which they were legally bound. Those federal laws and contracts superseded CDPHE's authority, and UCHA knew that the State policy was illegal because it conflicted with every federal law UCHA had operated under for decades.

262. At all times pertinent, UCHA could have, and should have, informed CDPHE that their policy violated known federal law, and compliance with that policy meant UCHA would commit fraud against the federal government and deprive Plaintiffs of their Constitutional and statutory rights. However, UCHA Defendants chose to act in concert with the State of Colorado when depriving Plaintiffs of their Constitutional and statutory rights for financial greed instead of complying with their legal obligations.

263. The State of Colorado willfully participated in the CDC COVID-19 Vaccination Program Provider Agreement[79] and allowed UCHA to participate on behalf of the State of Colorado and the Federal Government. Therefore, by extension, UCHA was also under a legal obligation to comply with 45 C.F.R. 46 §101, *et. seq* and the Belmont Report when administrating and administering the Federal Government's property (COVID-19 EUA drugs).

---

[79] "This program is a part of **collaboration** <u>under the relevant state, local, or territorial immunization's cooperative agreement with CDC</u>. To receive one or more of the publicly funded COVID-19 vaccines (COVID-19 Vaccine), constituent products, and ancillary supplies at no cost, Organization agrees that it will adhere to the following requirements…" (emphasis added). – See Exhibit A, Provider Agreement

264.    On August 30, 2021, CDPHE Director, Jill Hunsaker Ryan, and CDPHE's Director of Health Facilities, D. Randy Kuykendall issued a direct request to the CDPHE Board Members to vote on amending the State's licensure standards under 6 CCR 1011-1, Chapter 2 pertaining to healthcare facilities. D. Randy Kuykendall requested the new rules on behalf of CDPHE's executive team, stating, "the Department requests the Board adopt the following regulations requiring all licensed healthcare facilities to ensure their eligible employees, direct contractors, and support staff are fully vaccinated against COVID-19."

265.    The Board, accepting the request by Ms. Ryan and Mr. Kuykendall, voted on and approved the new Part 12 rules[80], which interfered with Plaintiffs' right to exercise their 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)[81] option and to enjoy employment in their chosen profession without consequence, thereby violating their Fourteenth Amendment Equal Protection and Due Process rights.

266.    The new "Part 12" rules amended the State's licensing requirements for healthcare facilities, stating in part:

> (12.2.1) "Each facility shall develop and implement a policy and procedure to ensure 100% of employees, direct contractors, and support staff have obtained full COVID-19 vaccination status in accordance with the schedule below."
>
> (12.2.1(a)) "All employees, direct contractors, and support staff must have received their first dose of the COVID-19 vaccination no later than September 30, 2021."
>
> (12.2.1(b)) "All employees, direct contractors, and support staff must have received their second dose of the COVID-19 vaccination (if applicable) no later than October 31, 2021."
>
> (12.2.1(c)) "All employees, direct contractors, and support staff must obtain a subsequent, or booster, dose of the COVID-19 vaccination should one be

---

[80] See Exhibit F, CDPHE Part 12 Rules
[81] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III): "to ensure that individuals to whom the product is administered are informed — 'of the option to accept or refuse administration of the product.'"

recommended by the Advisory Committee on Immunization Practices (ACIP), in accordance with the recommended timelines."

(12.2.1(e)) "On or after October 31, 2021, each facility shall ensure all newly hired employees, direct contractors, or support staff members have obtained full COVID-19 vaccination status, in accordance with this Part 12."

(12.2.4) "Each facility shall maintain the following documentation that may be examined by the Department, at any time, for purposes of verifying compliance with this Part 12. (A) Proof of immunization, as defined at 6 CCR 1011-1, Chapter 2, Part 1.51, or (B) A medical exemption signed by a physician, physician assistant, advanced practice nurse, or certified nurse midwife licensed in the State of Colorado stating that the COVID19 vaccination for the employee, direct contractor, or support staff is medically contraindicated as described in the product labeling approved or authorized by the FDA, or (C) Documentation of a religious exemption, as defined by facility policy."

267.    CDPHE Defendants knew they could not require facilities to "ensure 100% of employees, direct contractors, and support staff have obtained full COVID-19 vaccination" by "October 31, 2021."

268.    As previously discussed, no COVID-19 drug has been licensed by the FDA with a legal indication as a "vaccine" that has also been introduced into commerce for general commercial marketing. Therefore, it is an irrefutable fact that CDPHE Defendants mandated facilities to require individuals under their authority to have an unlicensed investigational drug injected into their bodies as a condition to continue employment after October 31, 2021.

269.    **No person has legal authority to require anyone to inject an unlicensed investigational drug into their body as a condition for anything. This statement is irrefutable by the Constitution, statute, treaty, or regulation.  Moreover, no person has legal authority to require anyone to participate in a product or activity under PREP Act immunity.**

270. CDPHE Defendants knew the laws and regulations associated with the investigational new drug classification and how those laws restricted them from enacting mandatory deadlines that relied exclusively on unlicensed investigational drugs for compliance.

271. HHS assigned CDPHE its Federal Wide Assurance number 00003044, indicating that CDPHE pledged never to place an individual under a "sanction" for refusing to participate in an unlicensed investigational medical product. Their assurance includes a pledge (duties) to abide by 45 C.F.R. 46 §101, *et. seq* and the Belmont Report when involving individuals with investigational new drugs (e.g., Pfizer-BioNTech COVID-19 Vaccine).

272. CDPHE also voluntarily agreed to comply with the terms and conditions of the CDC COVID-19 Vaccination Program Provider Agreement and knew that "facilities" that signed the CDC contract could not be required to mandate the use of COVID-19 INDs to Plaintiffs.

273. CDPHE Defendants enacted a rule that, as applied, required CDC COVID-19 Vaccination Program Providers to commit fraud against the Federal Government.

274. Number 12(a) of the CDC contract states, "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine," which means that Colorado, CDPHE, and facilities (e.g., UCHealth) are prohibited from amending the conditions that the HHS Secretary established for any EUA, and they must also obtain individuals' legally effective informed consent before administering an EUA product to those individuals.

275. Sanctions for refusing to inject an EUA drug into one's anatomy nullify legally effective informed consent and thus are fraud when healthcare facilities bill the U.S. Government for shots administered to employees under duress.

276.     The Provider Agreement warned CDPHE Defendants that "Non-compliance with the terms of Agreement may result in suspension or termination from the CDC COVID-19 Vaccination Program and criminal and civil penalties under federal law, including but not limited to the False Claims Act, 31 U.S.C. § 3729 *et seq*., and other related federal laws, 18 U.S.C. §§ 1001, 1035, 1347, 1349."

277.     The Part 12 rules, as applied, misrepresent CDPHE Defendants' authority because they mandate that healthcare facilities must participate in the use of EUA drugs. In turn, the facilities must also mandate individuals under their authority to participate in the use of EUA drugs.  The rules, as applied, are illegal[82] and unconstitutional and tempt facilities under CDPHE's authority to commit fraud against the United States Federal Government by ignoring the authority of the HHS Secretary and requiring that which the Secretary and Congress prohibit.

278.     UCHA informed Plaintiffs that, by "October 31, 2021" "Per the Colorado Board of Health Rules requirements - All health care workers, support staff, and direct contractors must receive the COVID-19 vaccine.  This applies to all CDPHE-regulated healthcare facilities.  The UCHealth requirement dates will not change."

279.     Therefore, when CDPHE Defendants enacted a rule requiring facilities to ensure 100% of individuals under their authority receive an injection of an unlicensed investigational COVID-19 drug before October 31, 2021, those rules led to the deprivation of Plaintiffs' Constitutional and federal statutory rights, which caused severe financial and emotional distress injuries.

---

[82] No person may establish conditions for accessing unlicensed drugs other than the HHS Secretary and not even the Secretary has the authority to compel participation.

280.     Part 12 Rules violate the well-established Unconstitutional Conditions Doctrine. The Supreme Court held that a person "may not barter away his life or his freedom, or his substantial rights." *Home Ins. Co. of New York v. Morse*, 87 U.S. 455, 451 (1874)

281.     The Federal Government owns or funds all COVID-19 drugs and issued explicit requirements to Defendants that persons must be allowed to accept or refuse those products without consequence.

282.     The Federal Government entered into an agreement with the State of Colorado whereby the State would utilize its existing immunization program to approve, supervise, and ensure state-authorized healthcare facilities and workers comply with the government's mandate.

283.     The CDC enacted a Vaccination Program requiring Colorado Healthcare Facilities and Providers to sign and follow should they participate in the joint action with the Federal and State Governments.

284.     That process required all Defendants to ensure persons were under the Equal Protection of Laws, and if not, then Due Process was the reason for that unequal application. Therefore, when all Defendants issued policies demanding Plaintiffs to surrender their 21 U.S.C. §360bbb-3 right to refuse as a condition to continue employment in their chosen profession, that requirement established an Unconstitutional Condition.

285.     The Fifth and Fourteenth Amendments of the U.S. Constitution are **required** duties of Defendants; they are not conditional, nor were Defendants authorized by any law to alter the Amendments by fiat rule. The U.S. Court held in *Frost & Frost Trucking Co. v. Railroad Comm'n, 271 U.S. 583, 593-94 (1926)* that a State "may not impose conditions which require the relinquishment of constitutional rights."

286. The State of Colorado, and UCHA, a political subdivision of the State, unassailably imposed conditions requiring Plaintiffs to relinquish their constitutional rights as a condition to continue employment in their chosen profession.

287. CDPHE Defendants did not deny access to living wages when it came to healthcare facilities or their employees who chose the 21 U.S.C. §360bbb-3 option to ***accept*** administration of an EUA product, but they did with respect to those who chose to ***refuse*** administration of an EUA product.

288. The option to choose is a power held by Plaintiffs that the State is **Constitutionally required** to protect equally. CDPHE Defendants knew of the 21 U.S.C. §360bbb-3 option and knew that no law allowed them to ignore that federal obligation when they issued Part 12 Rules.

289. CDPHE Defendants misrepresented their authority when enacting 12.1.1: "The statutory authority for the promulgation of these rules is set forth in Section 25-1.5-102, 25- 1.5-103, and 25-3-103, C.R.S.". CDPHE had no authority to enact rules amending 21 U.S.C. §360bbb-3 and citing state law as the means to bypass the Supremacy Clause of the U.S. Constitution was nothing more than a fraudulent attempt by CDPHE Defendants to deprive Plaintiffs of their legal authority.

290. When the Board voted on the new Part 12 rules, they usurped the authority of the U.S. Congress by amending federal laws and establishing conditions requiring that which Congress prohibits, mainly mandatory participation by healthcare facilities and workers in "covered countermeasures"[83] and or drugs, biologics, or devices[84] under emergency expanded access protocols.

---

[83] 42 U.S.C. § 247d-6d(a)(1)
[84] 21 U.S.C. §360bbb-3(a)(1)

291.    Moreover, Congress preempted, and the Supremacy Clause preempts, the authority of CDPHE Defendants from establishing conditions that conflict with or are different from any requirement under the PREP Act or any matter under 21 U.S.C. §360bbb-3. (42 USC 247d-6d(b)(8))

292.    The Part 12 rules deprived Plaintiffs of their 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) option to refuse, which automatically demoted Plaintiffs to second-class citizens because CDPHE Defendants refused to protect Plaintiffs' Fourteenth Amendment Equal Protection and Due Process rights. CDPHE Board Members declared by their vote that they would determine who would enjoy Fourteenth Amendment protections, not the United States Constitution, and any person choosing a 21 U.S.C. §360bbb-3 option they disagree with shall not be treated equally before the law.

293.    The Part 12 rules amended Article VII of the ICCPR Treaty by subjecting Plaintiffs to medical experimentation outside their free consent.

294.    The Part 12 rules amended the CDC COVID-19 Vaccination Program Provider Agreement the State willfully participated in by not adhering to Section 12(a) of the Provider Agreement requiring that "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine."

295.    The Part 12 rules amend 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) in violation of the U.S. Constitution and demonstrates CDPHE Defendants' breach of duty to Plaintiffs under the CDC Covid-19 Vaccination Program Provider Agreement.

296.    The Part 12 rules breach CDPHE Defendants' duties to Plaintiffs under CDPHE's Federal Wide Assurance agreement.

297.     The Part 12 rules breach CDPHE Defendants' duties to Plaintiffs under 21 U.S.C. §360bbb-3.

298.     The Part 12 rules breach CDPHE Defendant's duties to Plaintiffs under the PREP Act.

299.     The Part 12 rules breach CDPHE Defendants' duties to Plaintiffs under the Fourteenth Amendment (Equal Protection and Due Process).

300.     The Part 12 rules caused medical facilities to breach their institutional review board duties to Plaintiffs under 45 C.F.R. § 46.101, *et seq.*

301.     The Part 12 rules caused medical facilities to breach their duties to Plaintiffs under their Federal Wide Assurance agreements.

302.     The Part 12 rules caused medical facilities to breach their duties to Plaintiffs under their signed CDC COVID-19 Vaccination Program Provider Agreement.

303.     The wanton disregard for Plaintiffs' health and safety by CDPHE Defendants is demonstrated in their rule that they would only accept "A medical exemption signed by the physician…in the State of Colorado stating that the COVID-19 vaccination for the employee…is medically contraindicated as described in the product labeling approved or authorized by the FDA."

304.     Investigational new drugs are not labeled for their contraindications because they are investigational, and they have no legal indication to treat, cure, or prevent any known disease, nor are they labeled safe or effective. Manufacturers of INDs are prohibited from promoting their INDs as being safe or effective (21 CFR 312.7(a)) and have not been licensed to promote their IND drug with a legal indication.

305.    There are 19,000 FDA-licensed drugs, and when CDPHE enacted its new rules, three mRNA investigational COVID-19 drugs were available to Plaintiffs. Investigational New Drugs' formulations are continually amended from their resulting experiments.  Therefore, at a minimum, there were more than one trillion unknown potential contraindications[85] that mere months of research could not have effectively exposed or accounted for. For this reason, the FDA prohibited CDPHE, and anyone else, from requiring any person to involuntarily participate in one of the three COVID-19 EUA investigational new drugs.  An individual's own healthcare provider alone has the professional insight and knowledge of that individual's health to ascertain their viable participation in using an investigational new drug.  CDPHE ignored the standard of care rules and established conditions contrary to ethical medicine and professionalism.

306.    Moreover, since no licensed drugs existed with a label containing the required proof of contraindications, no medical exemption could be accepted as valid by any facility.  In other words, CDPHE Defendants established a requirement that could not be met, and that had potentially deadly consequences for individuals, demonstrating the moral turpitude of Defendants Ms. Ryan, Mr. Kuykendall, and Board Members.

307.    CDPHE Defendants also referred to the available COVID-19 EUA drugs as "vaccines," although the FDA only classified them as INDs. Thus, the CDPHE Defendants' goal of intentionally misrepresenting facts was to convince Colorado healthcare facilities that these

---

[85] 19,000 licensed drugs are in the marketplace.  The average number of medications Americans take is four (Team S. Prescription drug statistics 2023. The Checkup. Published September 2021. Accessed September 17, 2023. https://www.singlecare.com/blog/news/prescription-drug-statistics/#:~:text=How%20many%20prescriptions%20does%20the,at%20least%20one%20prescription%20medication.). There are 21 major chronic diseases in the U.S. (Chronic Conditions | CMS. Cms.gov. Published 2020. Accessed September 17, 2023.  https://www.cms.gov/data-research/statistics-trends-and-reports/chronic-conditions/chronic-conditions).  19,000 drugs interacting with just one mRNA drug contain more than 37,146, followed by 5,715 zeros potential adverse reactions.  When taking into account the 21 major chronic diseases that the drug could cause an adverse reaction to, the number is as numerous as the stars.  This fact is why it takes a drug years to come to market and years longer to be marketed as a vaccine.  This fact is also the reason why Pfizer and Moderna refused to ship their COVID-19 drugs outside of absolute immunity.

EUAs could be mandated as if they were licensed drugs and to give cover for the healthcare facilities to operate illegally and defy the U.S. Congress at the expense of Plaintiffs' Constitutional and statutory rights.

308.　At all times pertinent, CDPHE Defendants refused even to acknowledge that 21 U.S.C. §360bbb-3 existed, despite it being the **only** federal statute authorizing healthcare facilities and workers to administer the COVID-19 EUA drugs.

309.　CDPHE Defendants refused to discuss, inform, train, or educate the medical community about their legal obligation to ensure that healthcare workers administering the drugs must inform recipients of their legal rights to accept or refuse the product without penalty. CDPHE Defendants intentionally refrained from fulfilling their duties under 21 U.S.C. §360bbb-3 because the statute proves their actions were illegal, capricious, and violated the rights of medical facilities and healthcare workers[86] licensed by the State of Colorado.

310.　The Part 12 Rules mandate that Plaintiffs enter into a legally binding agreement under the terms and conditions established in 21 U.S.C. §360bbb-3 and the PREP Act outside of their free consent (see, *supra*).

311.　At all times pertinent, CDPHE Defendants did not inform Plaintiffs that to participate in the use of an EUA COVID-19 drug under PREP Act immunity meant they must voluntarily agree to forfeit their legal rights to judicial relief should they incur a physical injury from the drug's use or its administration.

---

[86] Healthcare facilities and their employees have the right to administer 21 U.S.C. §360bbb-3 medical products based on their standard of healthcare. The State of Colorado ignored 21 U.S.C. §360bbb-3(l) and unlawfully removed that right by mandating that which Congress prohibits.

312. Moreover, CDPHE Defendants did not inform Plaintiffs that they must allow medical researchers to utilize data resulting from their involvement with the drug for unknown purposes for eternity if they chose to participate.

313. Lastly, CDPHE Defendants never informed healthcare facilities that their employees had the right to refuse any product under 21 U.S.C. §360bbb-3 authorization or any covered countermeasure under the PREP Act without incurring a penalty or loss of benefits.

314. By direct extension, this intentional dereliction of duty by CDPHE Defendants led to the deprivation of Plaintiffs Constitutional and statutory rights when UCHA Defendants acted on the State policy. That loss of rights led to severe financial damages and traumatic emotional distress.

315. Issuing rules requiring a person to inject unlicensed investigational drugs used only in experimental conditions having more than one trillion unknown contraindications and knowing they were prohibited from issuing such a mandate under color of law demonstrates a most severe debased moral character. The loss of liberty, property, and life that might come from CDPHE Defendants' Part 12 Rules was apparently never part of their discussion.

316. The actions of CDPHE Defendants were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

### XIX. Legal Claims

317. The facts described above constitute a deprivation of several of the rights guaranteed to Plaintiffs by the United States Constitution, federal statutes, and treaties. These deprivations are actionable under 42 U.S.C. § 1983 because the Defendants acted under color of state law when issuing their COVID-19 vaccination requirements and administrating the CDC

COVID-19 Vaccination Program pursuant to the CDC COVID-19 Vaccination Program Provider Agreement and the federal statutes cited therein.

318.    Court precedent demonstrates that federal statutes and regulations with rights conferring language are enforceable under 42 U.S.C. §1983.[87]

319.    Defendants were, and are, restricted from attempting to use state law to amend the above-referenced statutes, regulations, treaties, agreements, and contracts due to the Supremacy Clause Doctrine. The Supremacy Clause Doctrine, and the express preemption language in the PREP Act and 21 U.S.C. §360bbb-3, restrict public and private employers from using state laws to require individuals to participate in any EUA or PREP Act activity or use any EUA or PREP Act product. This extends to any at-will employment law, doctrine, or custom an employer would otherwise claim as the right to interfere in the CDC Vaccination Program, 21 U.S.C. §360bbb-3, or PREP Act protocols and to amend conditions established by Congress for Plaintiffs' benefit.

## COUNT ONE

### 42 U.S.C. § 1983 – Deprivation of Legally Effective Informed Consent

320.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

321.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, 10 U.S.C. § 980, EUA Scope of Authorization letters, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

---

[87] *Maine v. Thiboutot*, 448 U.S. 1 (1980), the court held that "Even were the language ambiguous, however, any doubt as to its meaning has been resolved by our several cases suggesting, explicitly or implicitly, that the §1983 remedy broadly encompasses violations of federal statutory as well as constitutional law." See also, *Health and Hospital Corporation of Marion Cty. V. Talevski.*

322. 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) (the EUA statute) contains a required condition of the Secretary "to ensure that individuals to whom the product is administered are informed — 'of the option to accept or refuse administration of the product.'"

323. 21 U.S.C. §360bbb-3, the CDC COVID-19 Vaccination Program Provider Agreement, and each EUA's Scope of Authorization contains research conditions for COVID-19 medical products meeting 45 CFR 46.102(l)'s definition of research requiring adherence to 45 CFR § 46.101[88] *et seq.*

324. "Before involving a human subject in research covered by this policy, an investigator shall obtain the legally effective informed consent of the subject or the subject's legally authorized representative." 45 CFR 46.116(a)(1)

325. 45 CFR § 46.116 and the Belmont Report contain the only known definition of legally effective informed consent.

326. 45 CFR 46.116(b)(8) states: "A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."

327. The Belmont Report, having the force of law,[89] declares, "An agreement to participate in research constitutes a valid consent only if voluntarily given. This element of informed consent requires conditions free of coercion and undue influence" and "Respect for persons requires that subjects, to the degree that they are capable, be given the opportunity to

---

[88] "This policy applies to all research involving human subjects conducted, supported, or otherwise subject to regulation by any Federal department or agency" 45 CFR 46.101(a).
[89] 45 CFR § 46.101(c), 45 CFR 46.101(i), 45 CFR § 46.122

choose what shall or shall not happen to them. This opportunity is provided when adequate standards for informed consent are satisfied."

328.     Defendants breached their duties to establish "adequate standards" of informed consent when applying "sanctions," "coercion," "undue influence," and "unjustifiable pressures" on Plaintiffs to participate in COVID-19 investigational new drugs and devices (e.g., masks, testing articles). At all times pertinent, Defendants did not obtain Plaintiffs' legally effective informed consent.

329.     Article VII of the ratified International Covenant on Civil and Political Rights (ICCPR) Treaty affirms that "…no one shall be subjected without his free consent to medical or scientific experimentation."

330.     The Defendants' actions described above, individually and/or collectively, acting under color of state law, and in deprivation of the Constitutional rights and rights secured by the above federal statutes, regulations, and treaty, unlawfully subjected Plaintiffs to the use of investigational medical products under threat of penalty outside of their legally effective informed consent as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT TWO

## 42 U.S.C. § 1983 – Deprivation of Equal Protection Rights

331.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

332.     The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of

Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

333.    The Fourteenth Amendment to the U.S. Constitution guarantees equal protection of the laws.

334.    At all times pertinent, Defendants intentionally only penalized individuals who exercised their federally secured right to refuse administration of a product under the PREP Act or an EUA drug (e.g., Pfizer-BioNTech COVID-19 Vaccine), biologic, or device (e.g., masks, COVID-19 testing articles) thereby applying the laws unequally to and depriving Plaintiffs, of their Constitutional Equal Protection Rights.

335.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the Plaintiffs of their equal protection rights as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT THREE

### 42 U.S.C. § 1983 – Deprivation of Constitutional Due Process Rights

336.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

337.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

338.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees the right to due process of law before infringing a citizen's interest in life, liberty, or property.

339.    At all times pertinent, Defendants, having knowledge of Plaintiffs' Constitutional and federally secured right to refuse administration of EUA drugs and medical products, intentionally ignored those rights in an attempt to increase the number of participants in the CDC COVID-19 Vaccination Program for purposes of greed, resulting in the deprivation of Plaintiffs' substantive and procedural Due Process rights.

340.    "The fundamental requisite of due process of law is the opportunity to be heard." *Louisville & Nashville R. Co. v. Schmidt*, 177 U. S. 230, 177 U. S. 236. Defendants did not provide Plaintiffs with a date, time, place, or procedure to defend their right to refuse injection of an unlicensed drug before depriving them of their liberty and property.

341.    Defendants' requirement that Plaintiffs inject unlicensed drugs into their bodies as a condition to sell their labor "is not a legitimate exercise of the police power of the State, but an unreasonable, unnecessary and arbitrary interference with the right and liberty of the individual to contract in relation to labor, and, as such, it is in conflict with, and void under, the Federal Constitution." *Lochner v. New York*, 198 U.S. 45 (1905)

342.    Plaintiffs have the Constitutional right "to present [their] case and have its merits fairly judged." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982). At all times pertinent, Defendants refused to acknowledge Plaintiffs' Constitutional and Statutory rights, thereby nullifying impartiality.

343.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the

Plaintiffs of their substantive and procedural due process rights as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT FOUR

### 42 U.S.C. § 1983 - Deprivation of Rights Under the Spending Clause

344.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

345.    The laws cited in the CDC COVID-19 Vaccination Program Provider Agreement, 45 CFR §46.122, 10 U.S.C. §980, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

346.    In *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), "the Court has found that spending legislation gave rise to rights enforceable under §1983 only in *Wright* v. *Roanoke Redevelopment and Housing Authority,* 479 U. S. 418, 426, 432, and *Wilder* v. *Virginia Hospital Assn.,* 496 U. S. 498, 522523, where statutory provisions explicitly conferred specific monetary entitlements upon the plaintiffs, and there was no sufficient administrative means of enforcing the requirements against defendants that failed to comply." See also, *Health and Hospital Corporation of Marion County v. Talevski*, *supra*, 599 U.S. ____ (2023)

347.    The federal government appropriated funds to the Department of Defense to enter into contracts with the manufacturers of the EUA investigational drugs to purchase 100% of the products and to distribute them to the Organizations that signed the CDC COVID-19 Vaccination Program Provider Agreement.

348.    The federal government funds any charges associated with the administration of the COVID-19 EUA shots via Medicare.[90]

---

[90] https://www.medicare.gov/medicare-coronavirus

349. In the case at bar, the "specific monetary entitlement" to Plaintiffs, and any potential recipient, is that the EUA investigational drugs and their administrative costs are free of charge to the recipients.

350. 45 CFR §46.122 provides: "Federal funds administered by a Federal department or agency may not be expended for research involving human subjects unless the requirements of this policy have been satisfied."

351. 10 U.S.C. §980 states: "Funds appropriated to the Department of Defense may not be used for research involving a human being as an experimental subject unless – the subject's informed consent is obtained in advance…"

352. Only Organizations who agreed to participate in the CDC Vaccination Program can bill the government for administering the shots.

353. The EUA statute and the PREP Act lack any enforcement scheme for a breach of a potential recipient's right to refuse administration of an EUA investigational drug without penalty that would preclude §1983 enforcement.

354. Agreement Requirement Number 3 on the CDC Provider Agreement states, "Organization must not sell or seek reimbursement for COVID-19 Vaccine and any adjuvant, syringes, needles, or other constituent products and ancillary supplies that the federal government provides without cost to Organization."

355. Agreement Requirement Number 4 states, "Organization must administer COVID-19 Vaccine regardless of the vaccine recipient's ability to pay COVID-19 Vaccine administration fees."

356. These two provisions establish a specific monetary entitlement to the individual.

357.	Agreement Requirement Number 5 states, "Before administering COVID-19 Vaccine, Organization must provide an approved Emergency Use Authorization (EUA) Fact Sheet or vaccine information statement (VIS), as required, to each vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative."

358.	Agreement Requirement Number 5 complies with funding restrictions established by Congress in, 45 CFR § 46.122 and 10 U.S.C. § 980.

359.	The compliance is found in the EUA Fact Sheet, notating the individual's right to refuse the administration of the product. This express right is the fundamental requirement in obtaining the legally effective informed consent of the individual.

360.	Whether for civilians under 45 CFR § 46.122 or personnel under 10 U.S.C. § 980, Congress created a specific monetary entitlement for individuals considering whether or not to participate in a federally funded research activity. That entitlement means they have the explicit right to be informed of the risks, benefits, and alternatives to the research product and then consider whether to participate without incurring a fee or being under outside pressure to participate.

361.	This monetary entitlement is most apparent in the CDC COVID-19 Vaccination Program Provider Agreement. An individual can seek out a participating COVID-19 Program healthcare professional, obtain medical counseling, ask questions, and read literature. If they choose not to participate, they will not incur a fee from the professional for the administrative time spent considering whether or not to participate since the healthcare professional must inform them of their legal right to refuse under 21 U.S.C. §360bbb-3.

362.	The healthcare professional agreed to comply with the legally effective consent requirements via Agreement Number 12 on the CDC COVID-19 Vaccination Program Provider Agreement mandating that (1) "Organization must comply with all applicable requirements as set

forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine," and (2) "Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws."

363. The "all applicable requirements as set forth by the U.S. Food and Drug Administration, including…any EUA" extends to 21 USC 360bbb-3 (Section 564), 45 CFR 46, the FWA, the IRB, the ICCPR Treaty, and the Scope of Authorization letter.

364. Defendants were under explicit legal obligations to comply with 45 CFR § 46.122, 10 U.S.C. § 980 via their FWA agreement and their CDC COVID-19 Vaccination Program participation.

365. Therefore, the laws cited in CDC COVID-19 Vaccination Program Provider Agreement, 21 U.S.C. §360bbb-3, 45 CFR § 46.122, and 10 U.S.C. §980 clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983 when federal funds are expended under those provisions of law.

366. The Defendants' actions described above, individually and/or collectively, and in deprivation of the rights and privileges secured by the Constitution and the above statutes and regulations, refused to obtain the legally effective informed consent of the Plaintiffs in violation of spending legislation as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT FIVE

### Unconstitutional Conditions Doctrine - 42 U.S.C. § 1983

367. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

368. The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR §46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

369. "…the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence (emphasis added)". *Frost Trucking Co. v. R.R. Com*, 271 U.S. 583, 593-94 (1926)

370. CDPHE Defendants' Part 12 Rules informed healthcare facilities they would lose their government-issued license to operate[91] should they allow Plaintiffs to exercise their 21 U.S.C. §360bbb-3 right to refuse injection of an unlicensed investigational new drug.

371. By nexus, the Part 12 Rules established a condition requiring Plaintiffs to surrender their equal protection and due process rights before they could engage in the Constitutionally protected activity of selling their labor to Colorado healthcare facilities, violating the well-established Unconstitutional Conditions Doctrine.

372. UCHA Defendants enacted policies requiring Plaintiffs to surrender their Fourteenth Amendment rights (e.g., required to utilize EUA masks and tests) as a condition to

---

[91] 6 CCR 1011-1 Chapter 2.11.1(A)(8)

submit an exemption request. Additionally, Plaintiffs were not allowed to continue employment unless they voluntarily surrendered their Constitutional protections.

373. The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, manipulated the Constitutional rights of Plaintiffs out of existence as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT SIX

## PREP Act - 42 U.S.C. § 1983

374. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

375. The PREP Act, the CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

376. The PREP Act provides certain immunities to "covered countermeasures" when the HHS Secretary determines there is a public health emergency and makes a declaration of that emergency through the publication in the Federal Register specifying the conditions by which the covered countermeasure and covered persons can participate and the use of such covered countermeasure.[92]

377. Congress preempted the State of Colorado and its political subdivisions from establishing laws (Part 12 Rules) and continuing in effect with existing ones (at-will employment

---

[92] 42 USC 247d-6d(b)(1)

doctrine) that would otherwise interfere with Plaintiffs' authority with respect to "conduct undertaken" concerning "any matter included in a requirement applicable" to a "covered countermeasure" under the PREP Act or 21 U.S.C. §360bbb-3 including the required condition that Plaintiffs be informed of their legal right to either accept or refuse said countermeasure.[93],[94]

378. Congress was explicit that the HHS Secretary must establish conditions ensuring that "potential participants are educated with respect to…the voluntary nature of the program…"[95]

379. The "program" consists of those agreeing to manufacture, distribute, administer ("covered person"), and receive[96] ("covered individual") the product.

380. Congress expressly restricted the HHS Secretary from having any authority to require any person to participate in any activity involving a "drug," "biologic," or "device" under 21 U.S.C. §360bbb-3[97] or any "covered countermeasure" under the PREP Act. By extension, any person authorized to participate in the program is also restricted from mandating participation.

381. The State of Colorado and the UCHA political subdivision established laws and policies that conflicted with the PREP Act and 21 U.S.C. §360bbb-3 when they required Plaintiffs to participate in the use of a covered countermeasure under threat of penalty. Moreover, Defendants engaged in policy-making and conduct that conflicted with the PREP Act and the Fifth and Fourteenth Amendments of the United States Constitution.

382. Mandatory participation in PREP Act covered countermeasures is a severe violation of the Constitution's Due Process guarantees.

---

[93] 21 U.S.C. 301 is the Federal Food, Drug and Cosmetic Act, which ranges from §301 to §399, and thus includes 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).
[94] 42 USC 247d-6d(b)(8)
[95] 42 USC 247d-6e(c)
[96] 42 U.S.C. §247d-6e(e)(2)
[97] 21 U.S.C. §360bbb-3(l) – "Nothing in this section provides the Secretary any authority to require any person to carry out any activity that becomes lawful pursuant to an authorization under this section…"

383.    No person can be required to enter into a legally binding agreement requiring the forfeiture of legal rights under threat of penalty.

384.    The terms and conditions associated with the PREP Act and 21 U.S.C. §360bbb-3 represent a legally binding agreement as established by the U.S. Congress.  Those terms require Plaintiffs to forfeit their right to seek judicial relief from injuries sustained from the use of the countermeasure and injuries sustained from the countermeasure's administration. The agreement also requires Plaintiffs to divulge their private health information and private identity and assume greater risks to their health, safety, and legal rights.

385.    Defendants' pronouncement that Plaintiffs must participate in covered countermeasures prospectively denies Plaintiffs their due process rights should they incur injury because the PREP Act denies them access to judicial relief for those injuries.

386.    CDPHE Defendants' Part 12 Rules violated Plaintiffs' rights to accept or refuse participation in PREP Act covered countermeasures without pressure or influence being placed upon them.

387.    UCHA Defendants issued policies requiring participation in investigational drugs, testing articles, masks, and other devices under threat of penalty, violating Plaintiffs' right to voluntary participation and due process rights.

388.    Defendants changing the voluntary nature of the program into an involuntary program endangers the immunities of existing covered countermeasures established by the HHS Secretary. Defendants' interference is a direct assault on the Constitutional rights of Plaintiffs, which opens the doors to legal remedies not envisioned by Congress but required of the Constitution for resulting injuries sustained by individuals when under threat of penalty to participate.

389. The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, deprived the Constitutional and federal legal rights of Plaintiffs as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

**COUNT SEVEN**

**Breach of Contract, Third Party Beneficiary**

390. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

391. The CDC COVID Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR 46, 21 U.S.C. §360bbb-3, Title 21 of the US Code, the EUA Scope of Authorization letter clearly and unambiguously create third-party beneficiary rights.

392. The primary third-party beneficiary right intended for Plaintiffs is the freedom to consider participation in a federally funded EUA (drug, biologic, or device), PREP Act, or other emergency medical countermeasure products or activities that are free from "sanctions," "coercion," "undue influence," "unjustifiable pressures to participate. The other third-party benefit intended for Plaintiffs is that they must not fear the loss of benefits to which they are otherwise entitled when considering participation. Defendants issued a policy that was an "overt threat of harm"[98] to the financial and emotional well-being of Plaintiffs for the express purpose of coercing them to participate in the CDC COVID-19 Vaccination Program outside of their free will and voluntary consent.

---

[98] "Coercion occurs when an overt threat of harm is intentionally presented by one person to another in order to obtain compliance." — The Belmont Report

393.     The Defendants' actions described above, individually and/or collectively, and in breach of the CDC COVID-19 Vaccination Program Provider Agreement, deprived the Plaintiffs of the benefits intended to be conferred upon them through the terms and conditions of the CDC COVID Vaccination Program Provider Agreement as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT EIGHT

## Colorado State Common Law Employment Torts

394.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

395.     The Supremacy Clause, PREP Act, and 21 U.S.C. §360bbb-3 preempt State laws conflicting with the United States Government's emergency medical countermeasure objectives, including Colorado State's at-will employment laws.

396.     Defendants lacked authority to condition employment upon Plaintiffs participating in a 21 U.S.C. §360bbb-3 medical countermeasure or any product or activity under PREP Act authority.

397.     Defendants intentionally and unlawfully misrepresented their authority to Plaintiffs to cause them to surrender their constitutional and statutory rights.

398.     Defendants engaged in acts of coercion, undue influence, and retaliation, creating a hostile work environment.

399.     Defendants placed Plaintiffs under moral duress, knowing they exclusively relied on Defendants for access to living wages.

400.     Defendants segregated Plaintiffs under discriminatory acts upon Plaintiffs exercising their absolute right to refuse investigational new drugs.

401.     Defendants unlawfully altered Plaintiffs' employment schedules under coercive acts to punish them for exercising their absolute right to refuse investigational new drugs.

402.     Defendants attempted to coerce Plaintiffs to waive their federally secured right to refuse EUA investigational products and engage in a legally binding agreement under the terms and conditions (21 U.S.C. §360bbb-3 and PREP Act) established by the United States Congress outside their free will and voluntary consent.

403.     Defendants' actions demonstrate moral turpitude against Plaintiffs' rights, safety, and health.

404.     Defendants willfully and intentionally placed Plaintiffs under historic public and private pressure to enter into a legally binding agreement outside of their free will and voluntary consent.

405.     UCHA Defendants used fraud and deception to justify terminating Plaintiffs.[99]

406.     Defendants unlawfully terminated Plaintiffs' employment when Plaintiffs exercised their legal right to refuse 21 U.S.C. §360bbb-3 and PREP Act countermeasures.[100]

407.     The plaintiffs did not knowingly submit to the deprivation of labor, wages, or employment.

408.     The Defendants' actions, individually and/or collectively, and in derogation of Colorado's common laws, deprived the intended benefits conferred upon the Plaintiffs when enjoying employment in the State of Colorado as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

---

[99] *Wisehart v. Meganck*, 66 P.3d 124 (Colo. App. 2002)
[100] An employer may not terminate or constructively terminate an employee exercising a specific statutory right that is a matter of serious public concern. The forfeiture of rights under the PREP Act is a serious public concern. — *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992). See, *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540 (Colo. 1997), *Rocky Mtn. Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519 (Colo. 1996), *Kearl v. Portage Envtl., Inc.*, 205 P.3d 496 (Colo. App. 2008)

## COUNT NINE

### Extreme and Outrageous Conduct

409.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

410.    When the United States Congress refused to allow Defendants to apply consequences to Plaintiffs refusing to participate in the use of COVID-19 investigational drugs, Defendants engaged in a scorched earth policy. They inflicted, with malicious intent, severe emotional distress to the fullest extent that one in their positions of authority and power could inflict to the detriment of Plaintiffs' emotional well-being.

411.    Extreme and Outrageous Conduct is proven by (1) demonstrating that Defendants engaged in extreme and outrageous conduct, (2) Defendants' actions caused severe emotional distress, and (3) Defendants intentionally or recklessly caused the emotional distress.[101]

412.    The Defendants' conduct committed with gross negligence, reckless, or intent, as described above in the complaint, gives rise to a claim of Extreme and Outrageous Conduct under the common law of the State of Colorado against the Defendants for the damages described in Paragraphs 417 through 422, *infra*.

### COUNT TEN

### Implied Private Right of Action 21 U.S.C. §360bbb-3

413.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

---

[101] *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753 (1970); *Espinosa v. Sheridan United Tire*, 655 P.2d 424 (Colo. App. 1982); *see also Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo. 1999); *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877 (Colo. 1994); *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977 (Colo. App. 2011); *Green v. Qwest Servs. Corp.*, 155 P.3d 383 (Colo. App. 2006)

414.    Should the court not agree that UCHealth was engaged in State Action, Plaintiffs claim that 21 U.S.C. §360bbb-3 contains an implied private right of action pursuant to *Cannon v. University of Chicago*, 441 U.S. 677 (1979), *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990), and *Cort v. Ash*, 422 U.S. 66 (1975).

415.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty have deprived the Plaintiffs of their explicit right to refuse the administration of an emergency use authorized drug and/or medical product without penalty as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## XX.  Damages Recoverable and Demanded

416.    The following paragraphs are hereby incorporated by reference into Counts One through Ten, as if set forth here *in extenso*.

417.    As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Plaintiffs have suffered past damages and will suffer future damages, both compensatory and general, including, but not limited to, front and back pay; loss of benefits; loss of accumulated sick pay; loss of retirement accounts; lost earnings on retirement funds; vacation time, compensatory time, and paid time off; negative tax consequences (in the event of a lump sum award), including related accountant fees; attorney's fees; emotional distress; mental, psychological and physical harm; loss of income; loss of enjoyment of life; for which defendants are liable in compensatory, punitive, exemplary, legal, equitable, and all other damages that this Court deems necessary and proper.

418.    When the Defendants' behavior reaches a sufficient threshold, punitive damages are recoverable in § 1983 cases. *Smith v. Wade*, 461 U.S. 30 (1983).  Because Defendants' actions

were intentional and willful, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each and every Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions. *Smith v. Wade*, 461 U.S. 30 (1983)

419.     Because Defendants' actions involved reckless or callous indifference to the Plaintiffs' federally protected rights, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each and every Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions. *Smith v. Wade*, 461 U.S. 30 (1983)

420.     Because Defendants' actions were motivated by evil motive or intent, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each and every Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions. *Smith v. Wade*, 461 U.S. 30 (1983)

421.     Plaintiffs seek recovery of attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976 and 42 U.S.C. § 1988, and under any other provision of law or basis.

422.     Plaintiffs seek recovery of all court costs and out-of-pocket litigation expenses, including but not limited to expert fees, and legal interest on any amount of damages awarded.

### XXI.  Jury Trial Demand

423.     Plaintiffs are entitled to, and hereby demand, a trial by jury on all issues of fact herein.

WHEREFORE, Plaintiffs pray that Defendants be served with a copy of this Complaint and be duly cited to appear and answer same, and after due proceedings are had, there be judgment herein against the Defendants awarding Plaintiffs all damages claimed herein, plus legal interest,

taxable costs, expert fees, and attorney's fees, and all other relief determined to be just and equitable by this Court.

Respectfully submitted,

**SCHEXNAYDRE LAW FIRM**

BY:   /s/ *David J. Schexnaydre*
DAVID J. SCHEXNAYDRE, T.A.
Louisiana Bar Roll #: 21073
2895 Highway 190 • Suite 212
Mandeville, Louisiana 70471
Telephone: (985) 292-2020
Fax: (985) 235-1089
Email: david@schexnaydre.com
Lead Counsel for Plaintiffs